(No. 36153.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE WILSON, Plaintiff in Error.

*Opinion filed Sept. 27, 1963.—Rehearing denied Nov. 13, 1963.*

Adams, Weston & Montgomery, of Chicago, (James D. Montgomery, of counsel,) for plaintiff in error.

William G. Clark, Attorney General, of Springfield, and Daniel P. Ward, State's Attorney, of Chicago, (Fred G. Leach and E. Michael O'Brien, Assistant Attorneys General, and Elmer C. Kissane and James R. Thompson, Assistant State's Attorneys, of counsel,) for the People.

Per curiam: George Wilson (herein referred to as defendant,) William Perkins, and Allen Golson, were jointly indicted by the grand jury of the criminal court of Cook County in two separate indictments for murder, charging them with killing two postal inspectors. The defendant entered pleas of guilty on both indictments and was sentenced to death on each charge. Both cases are now before us on a writ of error.

The defendant contends that confessions which he made while in police custody were coerced by police violence; that the trial judge erred in denying a petition for a change of venue; that the court erred in denying the defendant's motion for a continuance based upon alleged prejudicial newspaper publicity; that the court deprived him of effective assistance of counsel by denying a motion for a severance; that the court erroneously denied a motion for a continuance which was sought to enable counsel to prepare for trial; and that the court erred in refusing to con-

duct a sanity hearing. All of these issues were presented to the trial judge prior to the defendant's pleas of guilty and it was only after adverse rulings on the various motions that the defendant entered his pleas. Normally, a plea of guilty waives all nonjurisdictional errors. (*People* v. *Deweese,* 27 Ill.2d 332.) However, a plea of guilty does not necessarily eradicate the effect of prior invasions of a defendant's constitutional rights. (*Commonwealth ex rel. Herman* v. *Claudy,* 350 U.S. 116, 118, 100 L. ed. 126, 76 S. Ct. 223, 224; *Chambers* v. *Florida,* 309 U.S. 227, 84 L. ed. 716, 60 S. Ct. 472; *Shelton* v. *United States,* (7th cir.) 292 F.2d 346, 337.) The claim here is that the court's rulings on the various motions coerced the defendant into pleading guilty. In view of this contention we shall consider the rulings of the trial judge on the various pretrial motions in order to determine whether the record supports the charge that the pleas of guilty were coerced. Cf. *People* v. *Smith,* 23 Ill.2d 512, 514; *People* v. *Heirens,* 4 Ill.2d 131, 141.

We consider first the contention that the trial court erred in denying the motion to suppress the defendant's confessions. The only witnesses to testify in support of the claim of coercion were the defendant and Perkins. The defendant testified that he and Perkins were arrested about 9 or 10 o'clock P.M. on March 19, 1960, and were taken to the police station where they were placed in separate rooms. The defendant testified that he was placed in a chair with his hands fastened behind his back and that police captain Frank Pape pounded him in the stomach while another officer "chopped" his neck and another officer pulled and twisted his ears. The defendant testified that they kept him in this room for about 20 minutes and that they kept asking him where the gun was and where Golson was. He first told them that he didn't know where the gun was and Capt. Pape beat him again and asked him about the gun. He then told Pape that he would get the gun if

they stopped beating him. About four officers took the defendant to 22nd and State streets where the officers recovered the gun. They then took the defendant to Perkins's room where they found some ammunition for the gun. After they found the ammunition they took the defendant to a tavern and then to a restaurant and pool hall, looking for Golson. They then returned to the police station and Capt. Pape told the defendant he wanted him to sign some confessions. The defendant testified that he "went along with their program" and signed three confessions. The first confession was signed by him alone, the second was signed shortly thereafter by him and Perkins, and two days later he, Perkins and Golson signed a joint confession. He testified that he could not read or write, except to sign his name, and that Perkins read the first two statements out loud before the defendant signed them. The defendant said that he orally admitted the killings about 40 minutes or an hour after he first arrived at the police station. The defendant testified that he told a police officer or assistant State's Attorney that it felt like his ribs were broken. The officer asked how he had been hurt and he told the officer that he had been hurt when Capt. Pape hit him. Thereafter, the defendant was examined by a doctor and he told the doctor his stomach was sore but did not tell him that he had been beaten.

Perkins testified that he also was beaten by Capt. Pape and another police officer for about 15 minutes. He was then taken to another room where the defendant had been confined, and the defendant was taken into the room where Perkins had been. Perkins testified that he was in the room next to the defendant for about four or five minutes and heard the defendant hollering as if he were in pain. He was taken to the State's Attorney's office at about midnight or 1:00 o'clock in the morning and at about 2:30 A.M. he signed a confession. About twenty minutes later Perkins and the defendant signed a joint confession. Perkins

testified that later that morning he was examined by a doctor. He told the doctor that he had a bruise on his chest in the region of his heart. On cross-examination he testified that the only time he was beaten was during the 15 minutes or so that he was in the room with the officers, and that 20 or 30 minutes after the beating he told the police the details of the murders.

Capt. Pape testified that he first saw Perkins in the east detective room at Central Police Headquarters. At this time Wilson was in the west room. Pape testified that he told Perkins that he knew that he was involved in the murders and said that from the statements of other witnesses it appeared that Perkins was the man who did the shooting. According to Pape, Perkins then said that he did not shoot the postal inspectors and that the defendant was the man who did the actual shooting. The defendant was then brought into the east room and Perkins repeated his story. The defendant first said that he did not fire the shots and that Golson was the one who did the shooting, but when Perkins told Wilson that the officers knew the truth, the defendant admitted that he fired the shots. Capt. Pape denied striking Perkins at any time and testified that no one in his presence struck him. Pape went on to testify that after Wilson admitted the shooting, Perkins was taken from the room and Pape then questioned the defendant for two or three minutes in the presence of two other officers and a postal inspector. He asked the defendant what he had done with the gun and the defendant said that it was in a room on Lake Park Avenue. He was asked whether he was certain that the gun was still there and he said that it would be there unless Golson took it. According to Pape the defendant went on to say that he had had a fight with Golson because Golson had stolen some money from him. Pape went out of the room and talked to Perkins and asked him if he knew what had happened to the gun and Perkins said that the defendant had pawned it. After

talking to Perkins, Pape went back and questioned the defendant again about the gun and the defendant admitted pawning it. Pape then sent the defendant out with two detectives and two postal agents and the defendant pointed out the store where he had pawned the gun and the officers retrieved it. Pape testified that he did not at any time beat the defendant and testified that no one in his presence had beaten him on the neck or pulled his ears. Pape testified that after the defendant had been examined by the doctor he asked him why he had been examined and the defendant replied that he didn't know, since he had no complaint to make and was not suffering from any injuries.

The other officers and the postal inspector who were present during the interrogation of the defendant testified that they did not beat or otherwise abuse the defendant and that Capt. Pape did not beat him in their presence.

A doctor testified that he examined both Perkins and the defendant. He found a small pinpoint tenderness on the left side of Perkins's chest. When he examined the defendant he asked him if he had any complaints and the defendant replied that he had no particular complaint and that nothing was bothering him. The doctor testified that he could tell by the defendant's appearance that he was not suffering. On examination of the defendant's lips he discovered teeth marks on the inside of his upper lip and another on the outside. He asked the defendant how this happened and the defendant told him it came from biting his lips. On examination of the defendant's chest the doctor discovered some tenderness and also a little swelling under the defendant's left ribs. The doctor examined the defendant's ears and his neck and found nothing abnormal. He did not ask the defendant how he got the swelling and the defendant didn't tell him. In rebuttal the defendant and Golson testified that they had not fought on the morning of March 18.

From this summary of the evidence, it is apparent

that there was a direct conflict between the testimnoy of the defendant and Perkins as to police brutality and the testimony of all of the officers who were alleged to have participated in this violence. It is also clear that there was no prolonged detention and questioning. According to the testimony of the officers, the defendant and Perkins orally confessed within 15 or 20 minutes. Even according to the testimony of the defendant and Perkins they orally confessed within 45 minutes. The question of the admissibility of a confession is for the trial court alone to decide and the court is not required to be convinced of its voluntary character beyond a reasonable doubt. (*People* v. *Sims,* 21 Ill.2d 425, 433.) On review the decision of the trial judge will not be disturbed unless manifestly erroneous. (*People* v. *Richardson,* 17 Ill.2d 253, 258.) The defendant argues that his testimony was corroborated by the doctor's testimony, and that therefore the ruling of the trial court was not sustained by the evidence. The doctor testified that the defendant never complained about having been beaten and also testified that he found no evidence of injury to the defendant's ears or his neck which tends to refute, rather than corroborate, the defendant's testimony. There is some corroboration in the doctor's testimony that he found some tenderness and swelling in the defendant's abdomen. However, according to both the doctor and the defendant, the defendant did not tell the doctor that the pain in his abdomen was occasioned by a beating. Capt. Pape testified that the defendant told him that he had had a fight with Golson. The trial judge could have reasonably concluded that the tenderness and swelling found by the doctor had been caused by that fight. We are of the opinion that the trial judge did not err in ruling that the confessions were voluntary.

We turn now to a consideration of the charge that the pleas of guilty were coerced in part by the denial of a petition for a change of venue. The record shows that this

petition was not filed until after the court had denied the motion to suppress the confessions and a motion to quash the indictments. It is well established that a petition for a change of venue after the court has ruled on any matter going to the merits of the case comes too late. (*People* v. *Deweese,* 27 Ill.2d 332, 335; *People* v. *Wilfong,* 17 Ill.2d 373; *People* v. *Chambers,* 9 Ill.2d 83.) Therefore, the denial of the petition for a change of venue was not erroneous and cannot be considered to have coerced the pleas of guilty.

The defendant also contends that the denial of a motion for a continuance on the ground of adverse newspaper publicity contributed to the coercion of his pleas of guilty. The motion was made on April 27 and the alleged prejudicial publicity had appeared in certain Chicago newspapers during the period from March 15 to March 22. Several of these articles appeared before the arrest of the defendant and described the crime and the search for the killers. After the defendant's arrest several articles appeared, in which the defendant was described as a narcotics addict with a criminal record. These articles also stated that the defendant had confessed and gave verbatim accounts of his confession. The motion alleged that the defendant desired a trial by jury and feared that he could not obtain a fair and impartial jury because of the newspaper articles. He therefore requested a continuance so that the prospective jurors might forget the details of the articles. In our opinion the denial of the continuance was not erroneous. At the stage of the proceedings at which the motion was made, the allegation that prospective jurors might be prejudiced was mere speculation. Ample opportunity would be afforded the defendant upon the *voir dire* examination of prospective jurors to determine whether a fair and impartial jury could be obtained, and the contention of prejudice would be more appropriately raised at that time. Since this claim could have been raised at a

jury trial, the denial of the motion cannot be construed as contributing to the waiver of a jury trial and the pleas of guilty.

The next contention is that the defendant was coerced into pleading guilty by the denial of a motion for severance. The motion alleged that the defenses of Wilson, Perkins and Golson were inconsistent. In support of that claim the motion alleged that the defendant claimed he did not shoot the two inspectors. It was further alleged that Perkins and Golson claimed that the defendant did shoot the two men, and that Perkins and Golson begged him not to shoot. In opposing this motion the prosecutor pointed out that the defendant, Perkins and Golson had signed a joint statement in which all three agreed on the facts surrounding the killings. The prosecutor agreed to use only this joint statement at the trial. In the joint statement the defendant admitted shooting the postal inspectors and admitted that Golson asked him not to shoot. The general rule is that persons jointly indicted for the commission of a crime should be tried together and whether a separate trial should be granted is largely within the sound judicial discretion of the trial court. The paramount inquiry is whether the defenses are of such an antagonistic nature that a severance is imperative to insure a fair trial. (*People* v. *Grilec*, 2 Ill.2d 538, 547.) In *People* v. *Lindsay*, 412 Ill. 472, we upheld the denial of a motion for a severance where the prosecutor had agreed that the only statements which would be used would be joint statements by the defendant and his co-defendant, or statements by the co-defendant which had been adopted by the defendant. The situation in the present case is practically identical and we are of the opinion that the denial of the motion for a severance was proper.

We will now consider the allegation that the defendant was deprived of due process of law and coerced into entering pleas of guilty by the denial of a motion for continu-

ance on the ground that counsel was not prepared for trial. The defendant did not file a written motion for a continuance, but after the denial of several pretrial motions counsel for the defendant stated that he had been rushed in every motion that he had made; that he did not have freedom of contact with his clients from day to day; that motions which he had expected to be sustained had been denied; and that he needed more time to prepare the case for trial. A motion for a continuance is addressed to the sound judicial discretion of the trial court and the court's ruling will not be disturbed on review unless it is shown that the discretion has been abused. (*People* v. *Clark,* 9 Ill.2d 46.) Before it can be said that such a motion has been improperly denied, it must appear that the refusal to grant additional time has in some manner embarrassed the accused in his defense and thereby prejudiced his rights. (*People* v. *Solomon,* 24 Ill.2d 586; *People* v. *Ritcheson,* 396 Ill. 146.) Where a motion for a continuance assigns no proper ground, the denial of the motion is not error and cannot be said to have coerced a plea of guilty. (*People* v. *Smith,* 23 Ill.2d 512.) In our opinion the reasons stated by counsel in his oral motion were insufficient to require the granting of a continuance and the denial of the motion was not an abuse of the trial court's discretion.

Finally, in support of his contention that the pleas of guilty were coerced, the defendant contends that the court erred in refusing to conduct a sanity hearing. It appears from the record that after the denial of numerous pretrial motions, defense counsel orally requested that the court give each defendant a preliminary medical examination to ascertain his ability to co-operate with counsel and understand the nature of the proceedings. The prosecutor objected and stated that there had been nothing brought to the court's attention that would indicate that such a hearing was necessary and the court denied the oral request of coun-

sel. We have held that if, before or during a trial, facts are brought to the attention of the court which raise a *bona fide* doubt as to a defendant's sanity, it is the duty of the court not to proceed until a jury has been impaneled and the doubt removed by a sanity hearing. (*People* v. *Burson,* 11 Ill.2d 360.) However, where no facts are brought to the attention of the court raising such a *bona fide* doubt the denial of a sanity hearing is not error. (*People* v. *Shrake,* 25 Ill.2d 141.) The oral statement of counsel did not point out any facts tending to show that the defendant was unable to co-operate with counsel or unable to understand the nature of the charges against him. Counsel for the defendant argues, however, that there had been evidence introduced at the hearing on the motion to suppress the confessions which indicated that the defendant was unable to co-operate with counsel. At that hearing the defendant testified that he had been in a hospital when he was about ten years old. The prosecutor at that time said that he was objecting to any further testimony if it appeared that the defendant had been in a mental hospital, and suggested that it was the court's duty to inquire into the defendant's sanity. Defense counsel replied, "Not necessarily." At the conclusion of the defendant's testimony at that hearing the prosecutor again suggested that if defense counsel had any information that the defendant had ever been committed to a mental institution or had ever been adjudicated insane, he should bring it to the court's attention. The court then stated that as he understood the testimony, the defendant had said that he had something wrong with his throat and asked defense counsel whether there was any question of sanity or insanity. Defense counsel then replied that he believed that the testimony showed that the defendant had a condition called "scapalo" which caused fainting spells and spasms. It is clear that this testimony concerning the defendant's hospitalization for this condition when he was ten years of

age was insufficient to raise any *bona fide* doubt as to his sanity at the time of his pleas of guilty. Counsel for the defendant also points out that the record showed that the defendant had used narcotics for a considerable period of time and that he had only attended school for one year. There is nothing in these facts to raise a *bona fide* doubt as to the defendant's sanity. The trial court did not err in denying the request for examination of the defendant and this denial cannot be considered to have coerced his pleas of guilty.

In addition to the contentions we have previously discussed concerning the charge that the defendant's pleas of guilty were coerced, the defendant argues that the two death sentences are void because the trial judge did not properly exercise his judicial discretion. The record shows that after a hearing in mitigation and aggravation, the following colloquy occurred:

"Mr. Montgomery: Yes, your Honor. The only thing I would like to address myself to is the fact that, the hunger of the community in the cases of Golson and Perkins that Mr. Genesen just referred to is something that I don't think your Honor should bring to bear in considering the defendant's sentencing.

The Court: I want to tell you this Mr. Montgomery, the only voice that I will listen to is the voice of my conscience when I do my duty.

Mr. Montgomery: I am sure of that, your Honor.

The Court: And the community will have absolutely nothing to do with it, nor anyone else. It would just be that voice that will speak to me and that is my conscience.

Mr. Montgomery: Your Honor, I have great confidence in that voice.

The Court: On top of that before I decide that phase, I shall make a fervent prayer in the morning and when

I have done that, that decision will be a result of what ever that says."

The court then quoted certain language from *People* v. *Riley*, 376 Ill. 364, setting forth the duties of a trial judge faced with the responsibility of imposing sentence after a plea of guilty by a defendant. The court said that in his opinion this language stated the situation clearly and in accordance with the way he understood the law. The following day counsel for the defendant made what he termed a "last ditch stand" and argued that the defendant should be entitled to some leniency and consideration in view of his pleas of guilty. The court replied:

"The Court: Mr. Montgomery, so you will understand, perfectly, I read yesterday a certain paragraph, two paragraphs of the opinion of Mr. Justice Shaw, Chief Justice of the Supreme Court of this State, which outlined exactly what I thought the law was on the subject. To tell you, to clear your mind, and mine, and everyone else's here, I pay no attention to anything except the evidence taken yesterday. I had that written up and I had it early this morning. As to what the State's Attorney intended or did not intend, had absolutely nothing to do with my decision in this matter. It is strictly as I stated."

The court then read a judgment order in which he stated that he personally did not believe in capital punishment but that he had taken an oath of office to support the constitution and the law and was required to follow the dictates of the legislature. The court stated that he had searched the record to determine whether there were any mitigating circumstances which would justify any penalty other than death and had concluded that there was no reason why the death penalty should not be imposed. The court concluded that if he were to impose a penalty other than death he would have to say that there was no case

in which the death penalty should be imposed and that he could not ask any jury to impose the death penalty when he himself would not follow the dictates of his conscience and of the statute. The court then stated that he had no alternative in the matter and fixed the defendant's penalty at death.

The defendant argues that the remarks of the trial judge indicated that his decision as to the penalty would be decided as the result of his morning prayer and the defendant argues that the judge's reliance upon his prayer required the defendant to subject himself to a force over which he had no control and forced him to meet evidence and contentions which were not in the record. In our opinion the statement of the court is not subject to the interpretation that the court would be guided solely by his prayer. It is clear from an examination of all of the remarks of the court that he earnestly and sincerely considered the matter of the defendant's punishment, with due regard to the law as stated by this court, after giving full consideration to the evidence in mitigation and aggravation. We find no impropriety in the fact that the trial judge indicated that he would also listen to the voice of his conscience and would seek spiritual guidance. We think it is clear that the penalty was imposed in the exercise of a sound judicial discretion.

We are satisfied from a careful review of the record that the defendant's pleas of guilty were not coerced and that the sentence was properly imposed. The judgment of the criminal court of Cook County is therefore affirmed and the Clerk of this court is directed to enter an order fixing Friday, January 24, 1964, as the date on which the original sentence entered in the criminal court of Cook County shall be executed. A certified copy of the order shall be furnished by the Clerk of this court to the sheriff of Cook County.

*Judgment affirmed.*