THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DAVID A. GREEN, Defendant-Appellant.

(No. 55996;

First District—December 8, 1972.

Gerald W. Getty, Public Defender, of Chicago, (Suzanne M. Kohut and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane, William Braverman, and William Hedrick, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

OFFENSES CHARGED

Murder. Ill. Rev. Stat. 1967, ch. 38, par. 9—1 (a—2) and (a—3).

Armed robbery. Ill. Rev. Stat. 1967, ch. 38, par. 18—2.

Aggravated assault. Ill. Rev. Stat. 1967, ch. 38, par. 12—2 (a—6).

JUDGMENT

After a jury trial, a verdict was returned finding defendant guilty of murder, judgment was entered, and defendant was sentenced to a term of 15-40 years. The jury's verdict also found defendant guilty of armed robbery but the record does not disclose any judgment thereon. By a third verdict, the jury found defendant not guilty of aggravated assault and judgment was entered thereon.

CONTENTIONS RAISED ON APPEAL

1. Defendant's statements were obtained in violation of *Miranda v. Arizona* and *Escobedo v. Illinois*.

2. The admission of defendant's statements, which were the only direct evidence of defendant's complicity in murder and robbery, was reversible error.

3. Defendant was not proved guilty beyond a reasonable doubt.

EVIDENCE

A short time after midnight on February 26, 1969, James Booker, a security guard for the Chicago Housing Authority, was shot while in the lobby of a CHA building located at 2544 S. State Street. His partner, Walter Todd, arrived at the scene 20 to 30 seconds after he heard the shot and observed defendant standing over the body. Todd saw defendant pick up an object and start to run out of the main entrance of the building. Defendant was ordered to halt but, instead, turned on Officer Todd with a raised pistol in his hand. The officer fired two shots, striking defendant in the chin, and he fell about six feet from the body of Booker. Todd then ran toward defendant and kicked the pistol from his hand. That gun was found to have belonged to the deceased. The murder weapon was never found. Todd had known defendant before, because he [defendant] lived in the building. Defendant was treated at Michael Reese Hospital and then taken to the police station where at

approximately 5:00 A.M., in the presence of four witnesses, he made an oral statement denying any role in the crime. No *Miranda* warnings had been given prior to this statement. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

On February 27, 1969, at about 5:30 P.M., two other police officers called the House of Correction and received permission to see defendant. When they arrived, defendant was in his bed, and when asked how he felt, replied "pretty good." Defendant and the two officers then walked down the hall to another room. There was nothing unusual about defendant's ability to walk. One of the officers gave defendant all of the *Miranda* warnings and defendant said he understood them. Defendant then made an inculpatory oral statement concerning the death of James Booker. When asked if he would sign a written statement, he stated that he wanted to talk to his mother first. He never asked to have a lawyer present. The officers called defendant's mother and went to her apartment to tell her of her son's request. She said she would see him the next day.

On February 28, 1969, two of the detectives who had obtained defendant's first oral statement saw him again in the police ward of Cermak Memorial Hospital. He was again advised of his *Miranda* rights and replied that he would sign a statement if his mother was notified. The detectives thereupon took an oral statement from him, left the hospital, and returned to the police station to call defendant's mother. Arrangements were made for her to be driven to the hospital.

On March 1, 1969, an Assistant State's Attorney met with defendant in the doctors' conference room at the hospital. Once more he was advised of his *Miranda* rights and this time voluntarily made a written statement again implicating himself in the murder of James Booker. In sum, then, defendant made four statements; the first three oral and the last written; the first exculpatory and the others inculpatory.

Defendant's mother never visited the hospital. She told the police that she was advised by her attorney not to go with the police when they took her son's statement because her attorney could not be present until a few days later. She talked to her son on the telephone and told him not to say or sign anything.

Defendant was 21 years old at the time of the crime. He testified that he had been a heroin addict for approximately a year and a half, that he had a $20 to $30-per-day habit, and that at the time of his first statement he was going through withdrawal. He testified further that the next two statements were taken after he had received shots and medication of some kind from the nurse and that he was not advised of his rights or that his mother had contacted an attorney to represent him until after

he talked with her on March 1. He admitted that before he gave his final statement, he was given the *Miranda* warnings, but claimed that he didn't understand them clearly. He also admitted that he had told the officers he felt pretty good, whereas in fact he was in pain and had just received some shots.

Defendant's first attorney, who did not take the case to trial, testified that on February 28, 1969, while he was working with the Legal Aid Bureau in Chicago, a case worker in his office asked him to represent defendant. He agreed to do so and understood that defendant was to be interviewed by the police on the following day, March 1. He telephoned the jail to inform the police and the State's Attorney's office that he could not attend the interview, and was told defendant was in the hospital. In these phone conversations he told the receptionist at the State's Attorney's office and Officer Sims at the jail that he was defendant's attorney, and asked that no interview take place until he could attend, but was informed by the case worker a few days later that the interview had been held and a written statement taken from defendant.

OPINION

At the trial the State made no attempt to introduce defendant's first statement into evidence; rather, the statement was elicited from the investigating officer by defendant's own counsel on cross-examination. As has been mentioned, it was completely exculpatory and denied any complicity in the crime. He stated that he was coming home from a poolroom on State Street and saw a gun lying on the floor near the elevators. He picked it up, intending to keep it or sell it, and as he turned around, was shot in the chin by Officer Todd.

His next three statements admitted his participation in the crime. They were to the effect that he had been with a friend, Charles Lee, all day on February 25, the day before the murder. That evening, about midnight, defendant and Lee walked from the third to the first floor of the building located at 2544 S. State Street and saw Booker standing in the door looking out the window. Lee walked up to the guard and put the gun to the back of his head and told the guard not to move. Booker began to turn away and reach for his gun, whereupon Lee shot him in the back. When the guard fell, Lee ran and defendant reached over to get the guard's gun. As he was holding the gun in his hand, the other security guard came down the steps and shot him. Defendant said that they killed the guard because they needed his gun to commit a robbery later that evening. Charles Lee was never apprehended.

Defendant filed a motion to suppress all four of the statements, claiming they were taken in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; and *Escobedo v. Illinois*, 378 U.S. 478, 84

S.Ct. 1758, 12 L.Ed.2d 977. A complete hearing was held on the motion, resulting in the exclusion of the first statement and admission of the other three. Defendant now argues that the admission of the three statements was reversible error because he was not advised of his constitutional rights when the first three statements were taken, and was denied his right to counsel. In the alternative, he argues that the first illegally obtained statement tainted the three which followed, thus rendering all four inadmissible.

■■■ We believe defendant's first alternative contention is without merit. A lengthy hearing was held on defendant's motion to suppress the four statements. Eight witnesses were called, and the judge considered detailed testimony before excluding the first statement (which was exculpatory). Defendant claimed he was not advised of his rights until the final statement was taken on March 1, and even then he did not fully understand what he was doing. Five police officers testified that he was given the proper warnings on all but the first occasion and were obviously believed by the court. It is for the trial judge and not this court to determine the credibility of the witnesses. His determination will not be upset unless manifestly erroneous which we believe it was not. *People v. Wilson*, 29 Ill.2d 82, 193 N.E.2d 449.

■■ Next, defendant argues that the spirit if not the letter of *Escobedo* was violated when he was "precluded" from the assistance of counsel at his interrogation. The facts do not support defendant's claim. Defendant's attorney testified that he was not asked to represent defendant until February 28, 1969, almost three days after the arrest. He never spoke to defendant but only to defendant's mother. He asked the officer of the day at the jail to delay the interrogation until March 5, but it was held as scheduled on March 1. There is nothing in the record to indicate that defendant ever requested to have his or any other attorney present at any of the interrogations. Furthermore, access to defendant could not have been denied during the first three interrogations since, by the lawyer's own testimony, he did not learn of the case until after the questioning had taken place. Even then, he did not communicate with defendant directly prior to the fourth statement, and defendant did not request to have an attorney present even though he was told he had a right to counsel. Demonstrating the extreme difference between this situation and that in *Escobedo v. Illinois*, 378 U.S. 478, 490, 84 S.Ct. 1758, 12 L.Ed.2d 977, the attorney here never saw or talked to defendant until the case was on trial.

*Escobedo* applies to the situation where "the suspect has requested and been denied an opportunity to consult with his lawyer * * *." Since no request for counsel was ever made, and since there is no medical

testimony to support defendant's claim that he was in a drugged condition and unable fully to understand his rights or his waiver thereof, all of which was denied by credible testimony of the police, we find that no constitutional right was violated.

■■ Next, defendant cites *Westover v. U.S.,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and *People v. Raddatz,* 91 Ill.App.2d 425, 235 N.E.2d 353, in support of his alternative argument that the first illegally obtained statement tainted the other three. Factually, however, defendant's cases are distinguishable from the case at bar. In *Westover,* a companion of *Miranda,* both of which were relied upon in *Raddatz,* defendant was arrested and held in custody for about 14 hours while he was questioned by local authorities. No warnings were given. Immediately thereafter he was turned over to the FBI and prior to their questioning was advised of his rights. Two and a half hours later, he confessed. The Supreme Court ruled that the confession obtained by the FBI was inadmissible because there was a continuous period of questioning for almost 16½ hours and "from Westover's point of view the warnings came at the end of the interrogation process * * * the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation." The court points out, however, that when there are multiple confessions, the lack of a proper warning before the first in-custody statement does not necessarily render inadmissible later statements made after appropriate warning when there is a removal in both time and place from the original surroundings.

*Raddatz* is factually similar to *Westover* in that defendant confessed to police under pressure and before warnings were given. He was taken immediately to the State's Attorney's office where he was then advised of his rights and immediately repeated his earlier confession. Both the trial judge and the appellate court agreed that the "warning came too late to dissipate the effects of the earlier interrogation at the police station." "The facts and circumstances of each case must be examined to determine the existence and extent of a causal relationship between the earlier, unconstitutional conduct and the later statement." *Gilpin v. U.S.* (5th Cir. 1969), 415 F.2d 638, 641-2.

In the present case we believe there is no causal relationship between the first police actions in regard to defendant's first statement and the three subsequent admissions by defendant. First, the initial statement was made in the police station at approximately 5:00 A.M. The second came almost 36 hours later in Cermak Memorial Hospital after defendant had rested and received treatment for his wounds. Thus, he was not under constant pressure, as in *Westover* and *Raddatz,* but was "removed both in time and place from his original surroundings."

Second, the initial statement was not an admission or confession but was exculpatory in nature and devoid of any damaging effect which would compel defendant to repeat a confession because "the cat was out of the bag." (*U.S. v. Trabucco* (5th Cir. 1970), 424 F.2d 1311.) Nothing damaging to defendant had been revealed by the first statement, so there is no way that it could have tainted the other three.

■■ It is true that *Miranda* directs that "no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' " (384 U.S. at 477, 86 S.Ct. at 1629.) Yet, as pointed out in *Trabucco*, *Miranda* spoke in terms of prosecution use of the statements to impeach defendant's "testimony at trial or to demonstrate untruths in the statement given under interrogation and thus prove guilt by implication." Here, however, the exculpatory statement was elicited by defense counsel on cross-examination and was not used in any way by the prosecution. Thus, defendant may not claim to have been prejudiced by his own use of the statement, and, furthermore, such use constitutes a waiver of any objection he may now seek to assert as to its admissibility.

Defendant's last contention, two sentences in length, is that without his statements to the police, the State's case failed to prove his guilt beyond a reasonable doubt. Since we have found that the statements were properly admitted, this argument must fall and the judgments are affirmed.

Affirmed.

LORENZ, P. J., and DRUCKER, J., concur.