THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN BRITZ, JR., Defendant-Appellant.

Fourth District    No. 4—83—0404

Opinion filed July 18, 1984.—Modified on denial of rehearing September 6, 1984.

Daniel D. Yuhas and Jane Raley, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Robert J. Biderman and Denise M. Paul, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

PRESIDING JUSTICE MILLS delivered the opinion of the court:

Murder.

Sentence: 25 years.

Because of grave error in the way the jury was selected, we must reverse the conviction and remand this case for a new trial.

### I. THE FACTS

On Saturday, June 9, 1979, at approximately 5:30 a.m., two Springfield residents living in the vicinity of a local gasoline service station heard a single gunshot, and then saw a young white man run

south down an alley. Bernard Ebel described the man he saw as being 17 to 21 years of age, medium build, with black or dark hair over his ears. He said that the man was clad in black pants and a white sport shirt with blue bands around the sleeves. Ebel stated that he could not make an identification because he saw only a side and back view of the individual.

Harold Martin was standing in his backyard feeding pigeons when he saw an individual attired in a manner similar to the person seen by Ebel. He saw the man's face for a few seconds. He estimated that the person he saw was 5 feet 7 inches or 5 feet 9 inches tall and 18 or 19 years old. He noticed that the individual was wearing high-heeled boots and had either wet or greasy hair which was slicked back and parted on the left side.

Shortly after the sighting, Martin began to drive to work and passed the gas station. On his way by he noticed a man whom he later discovered was Timothy Meisner. Meisner was lying on the pavement at the station next to a van. Martin tried to awaken the man, but when he touched him the man's arm fell to his right side, revealing a spot of blood. At this time police were called, and Martin and Ebel assisted them in making a composite sketch of the person they had seen running down the alley.

Dr. Grant Johnson, a pathologist, was called to the scene at approximately 6:20 a.m. and found Meisner lying on his back in front of the passenger side of a van. An air hose, hubcap, and screwdriver were found near the tire on the driver's side of the van. Johnson also found a wallet between Meisner's arm and chest with an identification card but no currency. No bullet casings were found at the scene of the crime.

Dr. Johnson eventually performed an autopsy on Meisner which determined that the victim had been shot with a single .22-caliber bullet, the bullet having passed through the upper portion of the right arm and major internal organs before coming to rest in the lower left portion of his chest. The entrance wound was minimal, leaving blood around the wound on Meisner's T-shirt but not elsewhere on his clothing or on the pavement. In Johnson's opinion, an assailant had shot Meisner from above the shoulder from a distance of three inches to two feet. Johnson felt that the wound was consistent with a scenario in which Meisner was kneeling and the assailant was standing. Johnson was also of the opinion that Meisner would have died within a minute after being shot, but noted that people with wounds inflicted by small-caliber bullets have been known to maintain life functions for a rather long period of time after the original wound. Dr. Johnson

was of the opinion that had this happened, it would have been possible for Meisner to have been in one position when shot and then moved to another position before dying.

In the early morning hours of Monday, June 11, two off-duty police officers were driving north on North 3rd Street in Springfield. They saw defendant John Britz. Both thought that he resembled the composite sketch of the person who had been seen fleeing the shooting scene two days earlier. They turned the car they were in around, but by the time they made the turn the defendant was gone. The officers continued to drive around Lincoln Park and soon saw Britz walking up a hill near a lagoon. At this point they identified themselves to him and called for an on-duty detective to come out in a squad car and question the defendant. Two detectives responded and told the defendant that he bore a striking resemblance to the composite sketch of the murder suspect in the Meisner case. After further questioning, Britz told them that he had just been released from Memorial Hospital in Springfield after a drug overdose. After determining the defendant's identity, one of the detectives gave him a ride to his destination at 2:45 a.m.

Later that same day, defendant contacted the Youth Services Bureau in Springfield. Although he spoke with several counselors during the course of the day, the defendant later called one of them—Cheryl Penman—and told her that "somebody had been murdered and that he had done this."

At this point, the investigation in the Meisner homicide began to focus on Britz. Springfield Detective Marcia Lange-Kemph went to Penman and asked her to consent to the use of an eavesdropping device on one of the telephones at the Youth Services Bureau. Penman consented. On July 3, 1979, Lange-Kemph executed an application for a court order which authorized the use of an eavesdropping device to overhear and record telephonic conversations between defendant and Penman. The authorization allowed the use of the eavesdropping device from 5 p.m. on July 3, to 4:59 p.m. on July 13. The device was installed on the telephone of another counselor at the Bureau. The scheme developed between Penman and the police was that whenever Britz telephoned the Bureau's answering service and asked to speak to Penman, she would return the defendant's call over the taped phone and engage him in conversations designed to elicit information about Meisner's death. Throughout this period, Detective Lange-Kemph coached Penman on how to draw information from the defendant.

Twelve conversations between defendant and Penman were re-

corded between July 6 and July 12. In each of these conversations, defendant repeatedly denied complicity in Meisner's death. At all times during these conversations, Penman told the defendant that she was truly concerned about him and advised him to confide in her and get anything that was bothering him off his chest. At various points throughout these conversations Penman also appealed to the defendant's masculinity, at one point telling him that she found him sexually attractive and thought that his involvement with the police was exciting. The final conversation lasted from 7:45 p.m. to 8:20 p.m. on July 12. It ended with Penman urging the defendant to talk to the police and the defendant agreeing to meet her at the police station to accomplish this purpose.

Britz had contacted the police twice earlier on July 12 to discuss the murder of Timothy Meisner. He was advised of his constitutional rights only before the third interview that day. The first appearance was an unexpected stop at the detective bureau, where defendant spoke with Detectives Lange-Kemph and Moss from 9:10 a.m. to 11 a.m. Following this conversation, the defendant went with the detectives to his father's junkyard. He gave the police a tour of the junkyard and led them to an area where he indicated he had had target practice with a .22-caliber weapon. The officers gathered certain items they thought might be connected with the murder. The second contact on July 12 came around noon, when the defendant telephoned the officers from the junkyard and told them he knew of someone who might have information that would be useful to them in their investigation. The third meeting came after the final phone call to Cheryl Penman. Penman, Detectives Lange-Kemph and Tolley and Police Chief DeMarco met defendant at the detective bureau between 10:30 and 11:30 p.m. Lange-Kemph advised Britz of his *Miranda* rights, which he said he understood and wished to waive.

At this point defendant told detectives that he had seen a man who resembled the composite of the murderer at the home of a friend. Lange-Kemph asked defendant if he knew the man's name, to which defendant responded that he did not. Lange-Kemph replied, "That's a lot of bull." She indicated that she knew defendant had paid a friend of his $50 to tell police that someone other than the defendant was involved in the homicide. When faced with this revelation, defendant admitted that it was true.

Britz then told the detectives that on the night of the murder he had been at the home of his cousin. Lange-Kemph again questioned the veracity of the alibi, and the defendant admitted that it was untrue. At this point the defendant became defensive, stating, "You'll

have to prove it." He asked to be left alone with Penman, and the detectives left the two in the interrogation room. Britz then ingested a pill which he claimed was "star acid." When the detectives returned to the room, defendant told them there were only two people who knew what had happened when Meisner was murdered. He said that he was one of the people and that "him"—gesturing toward the ceiling—was the other. He asked if he was free to go and the detectives explained that since he had come to the station voluntarily, he was free to leave voluntarily. He then left.

On July 13, defendant was arrested on a charge of theft based on a complaint filed by his father. At approximately 12:20 p.m. on July 14, the defendant (who was now incarcerated in the county jail) asked to speak to Detective Lange-Kamph and Chief DeMarco. The interview took place in DeMarco's office. Britz was orally advised of his rights by Lange-Kemph, who then presented him with a written statement of those rights. She read the statement to him, and the defendant read it to himself. Britz indicated that he understood his rights and executed a written waiver. Defendant then gave an inculpatory statement in which he said that he felt he had committed the murder. He recalled being at the Clark station in the early morning hours of June 9, hearing one shot, and carrying some kind of weapon. He also recalled running south down an alley toward 3rd Street, then under a viaduct, and finally in a northwesterly direction towards the Sangamon River. He talked to police for approximately one hour and then was returned to jail.

On July 14, the defendant, still in jail on the theft charge, asked to talk further with detectives. The request came at 8 a.m., and the defendant then talked with Detectives Tolley and Lange-Kemph and Chief DeMarco. Lange-Kemph orally admonished defendant of his *Miranda* rights and furnished him a written document enumerating those rights. Britz read the document, said he understood its contents, and signed a written waiver. During the interview that followed, defendant told the officers several details about his commission of the crime and what he did afterwards. He said that on June 9 he was angry and under the influence of PCP, an animal tranquilizer. He said that he approached the gasoline station from the rear and walked towards the men's restroom on the west side. He saw a van parked near an air pump and a man putting air into one of the tires. He stated that he walked up behind the man and shot him once with a .22-caliber revolver from a distance of four to six feet. He removed the victim's billfold, taking money out of it, and then dropped the wallet near the body. After this, defendant jumped over a fence which

bordered part of the service station. He then reiterated his previous statement concerning the route he took following the crime, including his eventually ending up at the Sangamon River, where he said he threw the pistol he had used into the water.

Chief DeMarco asked the defendant if there was any doubt in his mind that he shot Meisner, to which defendant replied, "[N]o, I did it." From this point on, defendant was considered to be in custody on a murder charge.

Shortly after the defendant finished giving his statement to the police at the station, Chief DeMarco suggested that he return to the scene of the crime with the detectives and reenact the crime. At the crime scene, Lange-Kemph again admonished defendant of his constitutional rights, which Britz said he understood and wished to waive. He then reenacted the crime. During this reenactment, he provided more details to the statement he had given previously. He indicated that Meisner was kneeling next to his truck when shot and then fell face down with his arms outstretched. The reenactment lasted from approximately 10 a.m. to 11:30 a.m., at which point defendant was returned to jail. Based on the facts known to the police at this time, the defendant was charged with murder, but those charges were dropped approximately one month later.

There was no further contact between the defendant and police for three years. At this point, the police obtained a search warrant based on a statement given by the defendant's brother which inculpated the defendant in the Meisner murder. On June 9, 1982, police officers, pursuant to the search warrant, went to the defendant's father's junkyard and removed two spent .22 projectiles from an inside wall of a trailer. On September 9, 1982, defendant told police that he had shot a bullet from a pistol into the wall of the trailer. At about 2 p.m. on September 9, 1982, defendant telephoned police at headquarters and asked to meet with Detective Daily. Daily spoke briefly with Britz and his wife at the detective bureau and then went with the defendant and his wife to the junkyard owned by defendant's father. Britz agreed to meet with the detective later in the evening, at which time he gave a statement, following *Miranda* warnings, in which he again stated his alibi that at the time of the homicide he was at a garage owned by his cousin, talking on the phone with Cheryl Penman. Defendant stated that his brother, who had given the police the information upon which the search warrant had been based, was in and out all night long and came back to the garage at approximately 5:30 or 6 in the morning and said something about a kid that had been killed. Britz told police that he may have been a witness to the homi-

cide and that he was willing to testify against his brother. Based on the further information and the two spent .22 projectiles, the defendant was charged by complaint with Meisner's murder and incarcerated on September 23, 1982.

On October 6, while still incarcerated on the murder charge, defendant telephoned Detective Pennell at home and asked Detectives Pennell and Daily to come talk with him at the jail. The detectives arrived at 6:55 p.m. and spoke with defendant in a room at the jail. Pennell told Britz about his rights and provided him with a written waiver which defendant signed.

Using the reverse side of the rights waiver as an easel, defendant drew a picture of the crime scene and asked Pennell to play the part of Timothy Meisner in order for him to illustrate how he committed the murder. Pennell kneeled on the floor and pretended to fill the tire of a van with air. Britz walked behind Pennell and using his finger, which he stated was a .22-caliber weapon, pretended to shoot Pennell in the upper portion of his right shoulder. Britz further stated that he took currency from Meisner's wallet and looked at the identification card in it before dropping it next to the body. He indicated that he ran south into the alleyway next to the station and then to his father's business at 3rd and Carpenter about seven or eight blocks away. Pennell left the room momentarily, at which point Britz told Detective Daily, "Al, I didn't mean to kill him. I didn't mean to kill him." The interview concluded at approximately 10:20 p.m.

Britz's trial began in April of 1983. *Voir dire* was conducted on April 25, 1983. The first issue raised by defendant concerns the manner in which *voir dire* was conducted by the trial court and is the issue which we deem dispositive in this appeal. We now turn to it.

## II. Voir Dire

Prior to the actual process of selecting the jury, defense counsel proposed a list of 50 questions which he sought to have the court ask during *voir dire*. The questions which were proposed may be categorized into four general topics. These are: whether the prospective jurors had a relationship with anyone in law enforcement; whether the prospective jurors were acquainted with any members of the victim's family; whether any of the prospective jurors were acquainted with each other; and whether the prospective jurors were willing to accept the trial court's instructions regarding the State's burden of proof and were willing to presume the defendant innocent until proven guilty. Three of the questions are quoted in their entirety:

"48. Do you understand that John throughout this trial,

throughout the presentation of the evidence, throughout the jury selection, into the jury room and through deliberations, is presumed to be innocent of these charges?

49. Do you understand that neither John nor his attorney have to prove anything? The law does not require the defendant or his attorney to produce any evidence whatsoever.

50. If you believe at the conclusion of all the evidence in this case, and after I have instructed you as to the law which you must apply, that if the prosecution has not proved each and every element of the offense or offenses beyond a reasonable doubt, can you and will you return to this courtroom with a verdict of not guilty?''

In this appeal, the defendant argues that the court's refusal to propose these questions—or questions similar in nature—was reversible error.

We agree.

■■ The *voir dire* examination of jurors is controlled by Supreme Court Rule 234 (87 Ill. 2d R. 234). The rule vests broad discretion in the trial court and specifically contemplates the consideration of inquiries submitted by the parties. The rule forbids the submission to the venire of questions directly or indirectly concerning matters of law or instructions.

In our opinion, the manner in which defense counsel's efforts at participating in *voir dire* was handled by the court requires us to reverse defendant's conviction.

Although the record is replete with occasions on which the defense attorney was forfended from participation in *voir dire*, only one example need be included to establish the tone adopted by the trial court.

"MR. LOCHER: Judge, would you please inquire of [the prospective juror] as to whether or not she has any relatives in law enforcement?

THE COURT: No—no.

[PROSPECTIVE JUROR]: Friends.

MR. LOCHER: May I approach the bench, please?

May we approach the bench? Jerry.

THE COURT: Wait a second.''

A recess was then declared during which the following colloquy occurred:

"MR. LOCHER: May it please the Court; counsel.

Judge, I respectfully renew my motion to voir dire the jury as the attorney for John Britz.

It's apparent from the voir dire examination that's taken place up to this point that very little is going to be elicited in the way of information about these prospective jurors that will enable me to determine whether or not they're biased or any prejudice they might have.

* * *

I have submitted based on the initial ruling of this court prospective questions which I respectfully submit to the court will assist me in determining whether or not these jurors are going to be fair toward my client and give us a fair trial. I would ask that those questions—all of those questions be asked.

* * *

And I submit that it denies us a right to a fair trial, and I object to this procedure, and I'd ask for permission to conduct the voir dire on the part of the defendant.

THE COURT: Motion denied; same ruling. I disagree with you entirely, Mr. Locher.

The Court is not an arbitrator. The court is the Judge.

MR. LOCHER: Uh-huh.

THE COURT: And I am attempting and I think doing the job.

Motion denied."

While we are convinced that the manner in which the trial court conducted *voir dire* would by itself require us to grant defendant a new trial, we note that relevant authority pertaining to the three proposed questions previously alluded to would lead us to the same conclusion. In *People v. Zehr* (1982), 110 Ill. App. 3d 458, 442 N.E.2d 581, the appellate court held that three virtually identical questions should have been asked by the trial court when submitted by defense counsel. The failure to do so was held to be reversible error. There the State had argued, as it does here, that the questions were properly refused as going to matters of law or instructions. The appellate court found otherwise, characterizing the inquiries as going to the heart of a particular bias or prejudice which would likely operate to deprive a defendant of his right to a trial by an impartial jury. We hold likewise, noting that our supreme court has placed its *imprimatur* on the holding of the appellate court in *People v. Zehr* (1984), 103 Ill. 2d 472.

Consequently, we hold that the manner in which the trial court conducted itself during *voir dire* was arbitrary and demonstrated a clear-cut abuse of judicial discretion. Additionally, at least three of the questions submitted by the defense attorney—(1) concerning the pre-

sumption of defendant's innocence; (2) about the absence of any burden of proof on the defendant; and (3) about the State's burden of proof—should have been asked under the dictates of *Zehr*. Since the questions were not posed and the subject matter not otherwise probed, we are compelled to reverse the defendant's conviction and remand this cause for a new trial, to be had in a manner consistent with the directives set down in this opinion.

III. ADMISSIBILITY OF STATEMENTS

The defendant in this appeal raised numerous issues concerning statements which he gave to the police and which were introduced at his trial. We turn now to the questions of their admissibility. The first argument raised by the defendant is that the inculpatory statements which were given to the police by him in 1979 were not voluntarily made, since at the time he was under the influence of Cheryl Penman. In his opinion, the influence of Penman was so pervasive that the statements were improperly found to be voluntary by the trial court, and thus the trial court's ruling that the statements were admissible at trial was in error.

■■ ■ It is well established that a statement must be voluntarily made in order to be admissible at trial. (*People v. Rhoads* (1979), 73 Ill. App. 3d 288, 391 N.E.2d 512.) In making a determination concerning the voluntary nature of a statement, a court of review must examine all of the relevant circumstances surrounding the making of that statement. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) The test to be applied is whether the statement has been made freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed. (*People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466; *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) The primary factors to be examined in determining the voluntariness of a statement go to the nature of the interrogation which leads to the statement. Factors to be examined include the duration of the defendant's detention prior to making the statement, the disregard of rudimentary necessities of life, deprivation of counsel, deception restricting the accused's constitutional rights, as well as the accused's age, education, emotional characteristics, and experience in criminal matters. The inquiry is, however, tinctured with the general rule that the finding of a trial court that a statement was voluntary may not be disturbed unless it is contrary to the manifest weight of the evidence.

Turning to the cases previously cited, we note that in *Hester* a murder confession given by a 14-year-old of subnormal mentality, who

had been held for 12½ hours during which there had been intermittent interrogation but not *Miranda* warnings, and during which he had been consistently admonished to get it off his chest, was held admissible. Similarly, in *Wipfler*, a chief of police, whom defendant admittedly trusted as a friend and father figure, admonished the defendant that " 'if someone did something wrong he should be a man and admit it.' " (68 Ill. 2d 158, 164, 368 N.E.2d 870, 871.) Following this admonition, the defendant was interrogated and eventually confessed.

■■ On appeal, Wipfler claimed that the police chief's counseling to tell the truth, when viewed as part of the total interrogation process, was coercive to the point of having compelled him to confess, especially in light of the chief's special position of trust in relation to the defendant. The supreme court held to the contrary, noting that the existence of the close relationship between the police chief and the defendant, coupled with the admonition to tell the truth, was but another factor to be considered in the totality of the circumstances surrounding the confession and did not render the subsequent confession *per se* involuntary. However, in *Wipfler* the court also went on to note that the police chief participated in the interrogation process only to a very minimal degree. He had merely told the defendant to tell the truth if he had done something wrong but did not discuss the particular crimes with which the defendant had been charged. Further, he did not act as an interrogator, nor was he engaged in a scheme with the police in an effort to soften the defendant for interrogation. However, in this case it is clear that the youth counselor, Penman, participated in the interrogation of the defendant up to and including the day of July 12, when defendant made his first statement to police. In this instance her participation was of a nature contemplated but not present in *Wipfler*, and as such it is our opinion that the statement given on July 12 should have been suppressed.

■■ Following his argument concerning the statement of July 12, the defendant then simply asserts that all the statements given in 1979 should have been suppressed as a result of Cheryl Penman's involvement with him. We disagree. We find little or nothing in the record to indicate that the statements made throughout the year of 1979 were in any way the product of the first statement on July 12.

In *People v. Green* (1972), 9 Ill. App. 3d 280, 292 N.E.2d 65, the defendant made four statements, the first exculpatory, the last three inculpatory. A motion to suppress was filed, and the court excluded the first statement while admitting the last three. The appellate court held that the illegally obtained statement did not taint the other three, because the defendant was not under consistent pressure and

was removed in both time and place from the original surroundings where he gave the exculpatory statement. Moreover, the court was willing to look at the first statement and find that it was not a confession. The court felt this was important because, since there was no confession on record, the defendant did not or could not feel compelled to repeat the confession in an effort to boost his credibility. Similarly, in this case, it is clear that Penman's attempts at eliciting information from the defendant ended at the same time as the authorization for the eavesdropping device, July 13. The day before, Britz had given an exculpatory statement which was not believed by the police. On July 14 and 15 defendant did confess to the crime. However, during this period there is no record evidence that Britz was in any way influenced by Penman. Britz was in custody during this time on another charge but was not being pressured to discuss the Meisner murder. Further, in each instance he *volunteered* to discuss the case with police while he was incarcerated. Since the eventual confessions given on July 14 and 15 were sufficiently attenuated by lapse of time, repeated admonitions and other factors, the statements made on July 14 and 15 were properly admitted.

### IV. Post-Indictment Statements

Defendant was ultimately charged by complaint on September 23, 1982, with the murder of Timothy Meisner. On October 2, 1982, the defendant, while incarcerated, asked to speak to detectives concerning the Meisner case. Britz was read his constitutional rights and advised that he had an attorney, had the right to have his attorney present, and that no conversations should be had without his attorney present. At this point the defendant waived his right to an attorney, saying he wanted to talk about the Meisner homicide. He then asked if his attorney could be there and whether he might be released if he gave a statement. Detective Pennell told the defendant that he would not let the defendant go if he made a statement and that it was unlikely that his attorney would come to the jail under the circumstances. At this point the defendant then agreed to talk about the homicide but went on to implicate his brother in the actual murder, indicating that he himself might have been there only as an eyewitness. Later in the same session, Britz said that he might have killed Meisner but that he was so intoxicated on narcotics that he did not clearly remember the events of the evening. Still later, he asked that he be given truth serum in an effort to find out whether he was involved in the crime. Pennell refused the request for administration of truth serum and admonished Britz that if he wanted to talk to anyone else in the future,

he should do it through his attorney.

On October 6, 1982, defendant again asked to speak to Detective Pennell at the Sangamon County jail. Pennell, along with Detective Daily, read the defendant his *Miranda* warnings. There followed a three-hour interrogation during which defendant made several incriminating statements, including reenacting the crime using Pennell as the victim, and indicating that he did not intend to kill the deceased.

■■ In this appeal, defendant argues that the facts are insufficient to support the finding of a knowing and voluntary relinquishment of his sixth amendment right to counsel prior to an interrogation had subsequent to the filing of charges. Britz argues that this calls for the suppression of the statement given October 6, 1982. The State responds that since the defendant voluntarily reinitiated his contact with the police on October 6, he relinquished his prior request to have counsel present and thereby waived the presence of counsel at the October 6 meeting.

In *Edwards v. Arizona* (1981), 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, the Supreme Court held that the police may not reinitiate custodial interrogation once a defendant has cut off questions by invoking either his right to remain silent or to have his attorney present. The court noted that such a request is of a continuing nature "unless the accused himself initiates further communication, exchanges, or conversations with the police." (451 U.S. 477, 485, 68 L. Ed. 2d 378, 386, 101 S. Ct. 1880, 1885.) In this case it is clear that defendant reinitiated the conversation with police on October 6, 1982, and at no time made an affirmative request for counsel. Under these circumstances, we find a knowing and voluntary waiver of counsel on this date, and therefore hold that the ruling that the statements were admissible was not error.

## V. EVIDENTIARY RULINGS

■■ Prior to trial, the State moved *in limine* to bar the defense from introducing the contents of 12 tape recordings taken from the office phone of Cheryl Penman between July 3, 1982, and July 12, 1982. The State's position was that the contents of the conversations in which defendant continually denied his guilt of the crime constituted self-serving declarations not qualifying under any of the hearsay exceptions. The court ruled that the defense could show that defendant's conversations with Penman were recorded but it could not present the contents of those conversations because they were hearsay. In this appeal, the defendant urges that the 12 tape-recorded conversations should have been admitted as nonhearsay, since they were

offered to prove the effect that Cheryl Penman had on the defendant's state of mind and his eventual decision to make incriminating statements to the police. We agree.

Much of the confusion at trial and many of the arguments in the parties' briefs before this court center on the application of the state-of-mind exception to the hearsay rule. The confusion is quite understandable, since the statements were not hearsay and therefore the state-of-mind exception had no bearing on their admissibility.

Our supreme court had the occasion to address the concept of hearsay evidence in *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738. The court noted that testimony must meet *two* criteria before it may be deemed hearsay and therefore generally inadmissible. " 'Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.' " (28 Ill. 2d 116, 121, 190 N.E.2d 738, 741, citing McCormick, Law of Evidence sec. 225; see also Cleary, Handbook of Illinois Evidence sec. 31.1 *et seq.*) Obviously, if the particular evidence fails to meet either of the criteria, it is not hearsay and is admissible.

In the case *sub judice*, it is apparent that the 12 tape recordings were not being offered for the truth of the matters asserted. Whether Britz was being truthful in his protestations of innocence had no bearing on the purpose for which the tapes were offered—the alleged involuntary nature of his eventual confession to the police. This was a proper purpose, since the question of voluntariness may be presented to the jury as a matter going to the weight to be attached to the words. (*Townsend v. Sain* (1963), 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745.) Since the defendant was entitled to present to the jury the question of the voluntary nature of his statements to the police, we hold that he should have been allowed to play the tapes made between July 3, 1982, and July 12, 1982, which reflected upon his state of mind at the time that later statements were given.

■ The penultimate issue raised by defendant in this appeal was that the trial court erred in refusing to grant defendant's motion *in limine*, which would have prevented the introduction of two spent .22-caliber bullets which had been removed from the interior wall of a trailer owned by defendant's father. In denying the motion, the trial judge noted that the slugs had "no probative value" but that he would not preclude their introduction, since in his opinion the defendant would be able to point out their lack of probative value in closing argument.

Krail Lattig, a firearm and tool mark examiner of the Illinois Bureau of Scientific Services, testified about the slugs. He said that he could determine if two different bullets had been fired from the same weapon, even if the weapon was not available for his examination, by comparing the bullet's class characteristics (comprised of caliber and rifling), and the bullet's individual characteristics. Lattig testified that he compared the two bullets removed from the trailer with the bullet removed from Meisner's body. He found that all three bullets had six lands and grooves, with a one-to-one ratio, and a right-hand twist. The bullets from the trailer were both .22-long rifle, but the bullet from Meisner was in such a bad state that the examiner could not determine whether it was a .22-long or .22-short. Based on his examination, Lattig testified that all three bullets could have been fired from the same weapon. He was, however, unable to make conclusive findings with respect to all three bullets because those extracted from the trailer were largely devoid of individual characteristics due to the fact that they were composed of soft lead and had been extensively damaged by impact. Lattig could also find no individual characteristics on the two bullets from the trailer that would preclude the possibility that they were discharged from the same weapon as the bullet found in Meisner's body.

Defendant's position here is that since relevant evidence is evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable, and that the slugs, by admission of the trial court, do not do so, their introduction was error. We disagree.

In our opinion, the relevancy of the bullets to the crime at hand is at least as great as the admittedly minimal relevancy of blood samples which were introduced in *People v. Gillespie* (1974), 24 Ill. App. 3d 567, 321 N.E.2d 398. In *Gillespie*, evidence was introduced at trial that dried blood found at the scene of a burglary was determined to be human, Type A, with a positive Rh factor. Blood samples taken from the defendant tested to be Type A, Rh positive, with a positive rheumatoid arthritis factor. There was also testimony as to the population frequencies of the blood type. In *Gillespie*, the defendant argued that the probative value of the blood sample was so minimal that the evidence should not have been introduced due to the fact that a huge numerical group of people shared the common characteristics. On appeal the court recognized that such evidence did not have great probative value, but nonetheless approved its admission since the blood in question exhibited particular characteristics differentiating it from blood generally.

Here, the bullets shared common characteristics in that all three showed six lands and grooves, a one-to-one ratio, and a right-hand twist. Both had been fired from a .22-caliber weapon, although the expert could not determine whether it was a .22-long or short. Further, testimony was adduced that the defendant had fired a .22-caliber pistol into the wall of the home from which the slugs were removed. Under these circumstances, we find that the apparently offhand comment by the trial court that the evidence had no probative value is simply not supported by the record. Hence, their admission was not error.

## VI. PROSECUTORIAL COMMENT

██ Finally, we briefly address defendant's last argument that the State's Attorney created prejudicial error by arguing that defendant's attorney had sought to create a smoke screen by putting the victim or the police on trial since the law and the facts were against him, and that the defendant's theory that he had confessed under duress while intoxicated was a red herring. We find that the comments were not error and were within the bounds of proper argument.

Generally, prosecutorial comment—couched in terms of specific trials and not intended to distract a jury's attention from the facts before them—will not be found to be error. The record here offers some rebuttal to the defendant's theory that he had confessed under duress while intoxicated, since several witnesses testified that the defendant was coherent at the times he gave the statements. Further, a closing argument, including the comment that the defense was attempting to create a "smoke screen" or pull off a "snow job," was specifically approved by our supreme court in *People v. Emerson* (1983), 97 Ill. 2d 487, 499, 455 N.E.2d 41, 46.

Under these circumstances, there was no error in the State's closing argument.

Reversed and remanded for a new trial.

TRAPP and WEBBER, JJ., concur.