The People of the State of Illinois, Defendant in Error,
v. James Mirbelle, Alias Eugene Belmonte, Plain-
tiff in Error.

Gen. No. 36,916.

534

GRIDLEY, P. J., dissenting.

Opinion filed July 6, 1934.

FRANCIS X. BUSCH and MARTIN C. WEISBROD, for plaintiff in error.

THOMAS J. COURTNEY, State's Attorney, for defendant in error; EDWARD E. WILSON, J. ALBERT WOLL and HENRY E. SEYFARTH, Assistant State's Attorneys, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

An information was filed which charged that defendant, on March 5, 1932, "did then and there unlawfully carry concealed on or about the person of him . . . a certain firearm, . . . " etc. Upon a trial by the court he was found guilty and sentenced to confinement in the house of correction for the term of one year and to pay a fine of $300.

For the People, O'Neal, a police officer, testified that he, with Officer Erickson, was "cruising" in a police car in the vicinity of Barry avenue and Clark street when he heard someone "holler, 'Hold up' "; that they parked the car, got out, and started to cross the street, and when they reached the middle of the street they pulled their guns; that they then saw defendant "walking east on Barry avenue in front of 732"; that behind defendant and walking in the same direction was one Kerbeck; that he and his partner "hollered"

to defendant and Kerbeck, "Stick them up, we are police officers, stick them up," and defendant "put his hands up" and as he did so the witness "saw the end of the revolver sticking up from underneath here. (Indicating the waist line)"; that "the handle was kinda sticking out"; that he observed the revolver without touching defendant; that, in the meantime, Officer Patterson had made Kerbeck put his hands up; that he (the witness) and Patterson then "put the two of them against the wall" and then lined up two other men who were brought in; that the patrol wagon came and defendant and the other men were taken to the station, where defendant gave his name and address. Upon cross-examination the witness testified that there was a gambling house at 742 Barry avenue, near the corner of Clark. The following examination then took place: "Q. Now at the time you saw Mirabelle he was not committing any crime was he? A. Not at that time, no. Q. And he was going along in a peaceful manner is that right? A. Yes, sir. Q. At that time you had no reason to believe he had committed a crime had you? A. Not at that time." The officer further testified that he stopped defendant because he heard somebody "holler, 'Stick up,'" and that he "figured that they may have something to do with it." "Now when you approached them you say without searching them and going through his pockets you observed the gun is that right? A. Yes. Q. You knew he had a gun? A. When I told him to put his hands up I saw the handle of the gun here. (Indicating.) Q. How was he dressed? A. In an overcoat and a gray hat . . . . Q. When you heard the shout of the 'Stick up' did you see where it came from? A. It came from the direction of the corner. Q. Well you didn't see the stick up on the corner? A. No, sir. The Court: You didn't see any stick up? A. No, sir. . . . Q. Do you know whose voice it was? A. It

sounded like a male voice. Q. Well do you know the person? A. I don't know." Officer Erickson testified, in substance, as follows: A man on the corner "hollered, 'Hold up' "; that he saw O'Neal and Patterson stop defendant and Kerbeck; that "about a minute later two other men came along, we were standing there and I stopped these two men and searched them. They had no weapons on them"; then two other men came along and he stopped them and searched them; that Kerbeck was about five feet behind defendant at the time that he first saw them; that he saw O'Neal take the gun "out of Mirabella's trousers, no, in his belt"; that at the station defendant told him that just prior to his arrest he had taken a girl home, who lived on Barry avenue; that defendant gave him the girl's name but that he had forgotten it; that defendant stated that he had just left the girl at her home and was on his way home when he was stopped; that he (the witness) never saw defendant before the time of the arrest. Upon cross-examination he testified that at the time they stopped defendant and the other men there may have been five or six people at the corner; that "there is always a lot of people around there," as it is "the intersection of Halsted and Clark"; that he did not then know who the defendant was or where he came from. "Q. As a matter of fact he acted the same as anybody else on the street? A. That's right. Q. In a well behaved manner? A. Yes, sir. Q. You didn't see him committing any offense or felony or crime of any kind, did you? A. No. Q. As a matter of fact he was submissive, was he not, in answers to your questions and did not give you any trouble? A. No, sir. The Court: Did you ask him any questions? A. I asked him his name and what he was doing. The Court: He answered you? A. Yes, sir. Q. He gave you an account of himself, didn't he in a coherent manner and

he told you who he took home? A. Yes, he said he took a girl home. Q. He gave you his address and he told you where he was going is that right? A. Yes, sir. Q. Did you go up into the gambling house there on Barry Avenue? A. Later on. Q. Later on. Did you mention a shooting or say it is a stick up or there is a stick up? A. No. Q. You didn't mention that? A. No, sir. Q. When was the first time you observed Belmonti and where was he? A. Well, he was just about in front of 742. Q. When you saw him (defendant) he was walking? A. Yes, he was walking. Q. You never saw him standing still? A. No, he was not standing when I saw him. He was walking East." On redirect he testified: "Q. When you first observed Mirabella or rather after the shooting or hold up did he walk any faster than he had been before, the same pace or any slower? A. No, he walked the same pace as far as I could observe. . . . Q. Did Kerbeck say anything about having been with Mirabella? A. No, he said he didn't know him. Q. Did Mirabella say the same thing? A. He said the same thing, they denied it. Q. Did they at the time tell any different story? A. No, sir." The foregoing is the entire direct testimony on behalf of the People. Defendant testified that he lived at 1330 Edgemont avenue, was a brick layer, and had worked for the Fullerton Structure Company for seven years; that on the day in question he had taken a girl to her home on Barry avenue and that he gave the officers her address; that after he had taken the girl home he was walking west on Barry avenue when he saw five or six men come out of the side door of a candy store on the left side of Barry avenue with their guns out; that they stopped everybody on the street; that they came across and searched him and then placed him in a hallway of a garage, and that about ten minutes later the police wagon came along and took him and others

to the Sheffield avenue police station. Defendant denied that the officers found a gun on his person and stated that at the police station the officers did not ask him any questions in reference to a gun nor did they show him a gun at any time; that he did not carry a gun that day nor did he ever carry a gun; that at the time the police had him lined up in the hallway they also had five other men lined up with him; that until the time of the arrest he had never seen Kerbeck. On rebuttal O'Neal testified that he had never seen defendant before the time in question and did not know "any past history he may have had"; that "there was nothing about him any different than anybody else on the street." Upon cross-examination the officer stated that at the time there was a lot of confusion around the place, but that he was positive that he took the gun from defendant.

In deciding the case the trial court made the following statement: "The Court: Well, the Court believes from the evidence shown beyond a reasonable doubt that the defendant carried the weapon that was introduced into evidence at the time he was arrested, and I think that the evidence was sufficient to show that the police had a right to stop him at that time. There was a commotion, a cry of a hold-up, they would not have been very good policemen if they did not stop people in the immediate vicinity at that time, so there will be a finding of guilty."

Before the trial commenced defendant's counsel orally moved the court to suppress the evidence of the search and seizure, on the ground that the arrest was illegal. The following then occurred: "The Court: All right, why not let the officers put in their testimony and I will consider your motion to suppress the evidence after your examination of the officers. Mr. Rosensweig (counsel for defendant): All right, your Honor. In other words you will reserve your decision

on the motion to quash until after you have all the evidence in this case. The Court: That's right. Mr. Rosensweig: In other words your Honor, I want it understood I have a motion to suppress the evidence pending and all rights that may come to my client by virtue of that motion are not waived. The Court: Yes, that's the understanding. We will hear the evidence on the motion to quash on the case in general. Mr. Rosensweig: All right." At the conclusion of the State's evidence defendant's counsel renewed his motion, which the court then overruled. Defendant contends that "the court erred in overruling plaintiff in error's motion to suppress the evidence." The People contend that as the motion to suppress was an oral one and no written petition or affidavit setting forth the grounds for the motion was filed or offered, the trial court was justified in overruling said motion. There is no merit in this contention. At the time the oral motion to suppress was made the People made no objection to the form or substance of the same and the trial court entertained the motion and stated that he would consider and determine it after the officers had been examined. When counsel for defendant, at the conclusion of the People's evidence, renewed the motion, the People made no objection at that time to the form or substance of the motion and the trial court passed upon it and determined it adversely to defendant. While it is true that a verified petition or affidavit would have been the proper procedure, nevertheless, in view of the attitude of the trial court and counsel for the People, the latter are in no position to now raise the instant contention.

Paragraph 681 of the Criminal Code, Cahill's St. ch. 38, reads as follows:

"Arrests without warrant.) Sec. 4. An arrest may be made by an officer or by a private person without warrant, for a criminal offense committed or attempted

in his presence, and by an officer, *when a criminal offense has in fact been committed,* and he has reasonable ground for believing that the person to be arrested has committed it.''

In the recent case of *People v. Fischetti,* 273 Ill. App. 215, we held that where a defendant is arrested and searched, while committing no offense, by police officers without a warrant, the People, upon defendant's motion to suppress the admission of the weapon as evidence, were bound to prove that a criminal offense had been committed in fact and that the defendant was reasonably suspected of committing it. In that case we reviewed, at length, the authorities bearing upon the subject, and it is unnecessary for us to here repeat what we there said.

In the instant case the People contend that ''defendant was not arrested until after officers viewed the concealed weapon on his person.'' On the other hand, defendant strenuously contends that he was arrested when the officers, with drawn weapons, ''hollered'' to him to ''stick them up, we are police officers, stick them up,'' and he complied with that order.

''The word (arrest) is 'derived from the French, arreter, to stop or stay, and signifies a restraint of a man's person; depriving him of his own will and liberty, and binding him to become obedient to the will of the law. It is called the beginning of imprisonment.' *Legrand v. Bedinger,* 4 T. B. Mon. (Ky.) 539, 540.'' (5 C. J. 385.)

''An arrest consists in taking, under real or assumed authority, custody of another person for the purpose of holding or detaining him to answer a criminal charge or civil demand. . . . The custody or control, the assumption of which is involved in an arrest, imports actual restraint or detention, the mere utterance of words indicative of an arrest being insufficient, except perhaps when followed by submission . . . . An arrest is not consummated until there has been a

taking of possession of the person by manual caption or otherwise, but the requisite control may be assumed without force, and in any manner by which the subject of the arrest is brought within the power or control of the person making it. Nor is manual touching necessary, where the subject of the arrest submits thereto or is otherwise actually subjected to restraint. But, where the person resists arrest, some manual touching of the body has been held necessary to consummate the arrest.'' (5 C. J. 385-6.)

''An arrest is the taking of a person into the custody of the law. It has also been judicially defined as the taking, seizing, or detaining the person of another; touching or putting hands upon him, in the execution of process, or any act indicating an intention to arrest. . . . An arrest, in the strict legal sense of the term, involves three elements: authority, intention, and a restraint of the person. . . . There must be an intention, understood by the one arrested, to accomplish the arrest. . . . A restriction of the right of locomotion is the most characteristic element of the arrest. . . . An arrest is effected when the party is brought within the power of the officer, an actual manual touching not being essential.'' (2 Am. & Eng. Ency. of Law [2d ed.] 834-6.)

''In order that submission may take the place of an actual touching and render the arrest complete, it must be real and made while the person arrested is in the power of the one arresting.'' (2 Am. & Eng. Ency. of Law [2d ed.] 838.)

In Corpus Juris and American and English Encyclopedia of Law (above cited) will be found many cases supporting the principles of law stated therein, and to which we have just referred. Archbold, in his work on Criminal Practice and Pleading (8th ed.), vol. 1, p. 81, states:

''(1) An arrest in criminal cases, is the apprehending or detaining of the person, in order to be forth-

coming to answer an alleged or suspected crime. Burn Just. tit. *Arrest.* *Hart v. Flyn,* 8 Dana, 190; *Lawson v. Buzines,* 3 Harring. 416.''

''Acts which amount to a taking into custody are necessary to constitute an arrest; but there need be no actual force or manual touching the body; it is enough if the party be within the power of the officer and submit to the arrest; Cas. *temp.* Hardw. 301; 5 B. & P. 211; *Huntington v. Blaisdell,* 2 N. H. 318; *Hart v. Flynn's Ex'r,* 8 Dana (Ky.) 190; *Strout v. Gooch,* 8 Me. 127; *Bissel v. Gold,* 1 Wend. (N. Y.) 215, 19 Am. Dec. 480; *Field v. Ireland,* 21 Ala. 240; *Courtoy v. Dozier,* 20 Ga. 369; *Cooper v. Adams,* 2 Blackf. (Ind.) 294; but mere words without submission are not sufficient; 2 Hale, Pl. Cr. 129; *Jones v. Jones,* 35 N. C. 448; *State v. Buxton,* 102 N. C. 129, 8 S. E. 774.'' (Bouvier [8th ed.] vol. 1, p. 241.)

Formerly it was held that the word ''arrest'' was more properly used in civil cases and ''apprehension'' in criminal cases, but the words are now very generally used interchangeably, and in Divisions VI and VII of our Criminal Code, relating to ''pursuit of felon,'' ''arrest of offenders,'' etc., ''arrest'' and ''apprehension'' are so used.

In support of its contention that under the law and the facts the officers did not arrest defendant until they observed the revolver upon his person, the People cite the following cases: *State v. Holmes,* 4 Pennewill's (Del.) 196, 55 Atl. 343, 345; *State v. Gulczynski,* 32 Del. 120, 120 Atl. 88; *Williamson v. State,* 140 Mass. 841, and *Genner v. Sparks,* 1 Salk. 79. *State v. Holmes* has no bearing upon the contention of the People. The case that follows it in the Reporter is *Petit v. Colmary,* p. 344, and we find from a reading of the same that the Reporter has seen fit to quote in full a charge to a jury made by a *nisi prius* judge in an action for alleged false imprisonment. In *State v. Gulczynski* the ar-

resting officer had been told that the defendant was violating the liquor law and thereafter the officer found him on the street carrying a package which the former believed contained intoxicating liquor. Thereupon the officer asked the defendant what he had in the package and the defendant replied, "Liquor, two gallons." The court held that:

"The possession constitutes the crime, and if the officer sees the liquor in the possession of the accused, or the accused admits he has it in his possession, the offense is committed in the presence of the officer in legal contemplation and an arrest can be made without a warrant. If the defendant's arrest was legal the search of the prisoner after his arrest was also legal." *Williamson v. State,* 140 Mass. 841, is another erroneous citation. We find, however, *Williamson v. State* in 140 Miss. 841. There a sheriff had probable cause to believe that an automobile was transporting intoxicating liquor in violation of the law, and he placed his car upon the highway in such a manner as to cause persons traveling the highway to slow down, and the defendant, traveling the highway in an automobile, was thereby caused to slow down, and the sheriff, using a flashlight, saw kegs of liquor on the seat of the automobile and he asked the defendant what was in the kegs, and the defendant replied, "Whiskey," and the court held that under such a state of facts the sheriff was then authorized to arrest without a warrant and to seize the intoxicating liquors without a warrant. The court stated that:

"Under the facts detailed in this record, nothing was done to coerce either Williamson or Roberts into making any statement. They made the statement of their own accord and without compulsion, and before either an arrest or a search had been made. It was no violation of the law for the officers to ask the question, or to look at the kegs in the car seat."

In *Genner v. Sparks,* an old case, a sheriff said to the defendant, in the latter's yard, "I arrest you." The defendant, in order to prevent the sheriff from touching him, held a pitchfork in front of the sheriff and in this way succeeded in retreating to his house without the sheriff touching him or reaching him. It was held that under these facts there had been no actual arrest. In that case there was not only no submission by the defendant to arrest but an armed resistance to it which enabled him to escape. None of the cases cited by the People is an authority in support of the instant contention. We are satisfied that under the facts of the instant case and the law, the arrest of defendant had been made before the officers observed the gun upon his person. The State's evidence shows that police officers, armed with revolvers, approached defendant, announced that they were officers, and commanded, in effect, that defendant surrender, whereupon he immediately put up his hands, thereby plainly indicating that he complied with their command, and submitted to arrest. In view of the evidence, the argument of the People that we should hold that prior to the time the officers observed the gun they had merely "stopped the defendant for questioning," is an idle one. While a mere interrogation of a citizen by a police officer as to a criminal offense or a suspected criminal offense does not constitute an arrest, the practice of making an "arrest for questioning" was condemned in *People v. Scalisi,* 324 Ill. 131, 146.

The People contend that if we decide that there was an illegal arrest in the first instance we should also hold that the officers made a second arrest when they observed a concealed weapon upon defendant's person, and it is argued that if we so hold, the illegal arrest may be ignored and the seizure justified upon the ground that the second arrest was legal. It is a sufficient answer to this contention to say that the facts

would not warrant us in so holding. The People cite *McAdams v. State,* 30 Okla. Crim. 207, 235 Pac. 241, in support of the instant contention. In that case, police officers, without a warrant, on suspicion merely, were *attempting* to arrest a person suspected of the commission of a misdemeanor (transporting whiskey). The officers, in a Ford automobile, pursued the defendant and two companions, who were in a Cadillac automobile, for the purpose of halting the car to search it for whiskey. The defendant and his companions refused to halt, although commanded to do so, and although the officers shot into their car. During the pursuit several packages were thrown from the Cadillac car to the roadside and after that car stopped and the defendant and his companions were placed under arrest, the car was searched and two empty whiskey bottles were found in one of its side pockets. An officer found one of the packages that had been thrown from the car and it was found to contain whiskey. Later, after the defendant and his companions were lodged in jail, and a further search along the roadside was made by the officers, they found two more half-gallon jars of whiskey. The Supreme Court of Oklahoma held that while *the attempt* to arrest the defendants on suspicion without a warrant was illegal, and should be severely condemned, that, nevertheless, after the officers saw packages of liquor thrown from the car the arrest of the defendant was then consummated legally, as the offense of transporting whiskey had been actually committed in the presence of the officers. The court said that ''after *the initial illegal attempt to arrest proved futile,* and the officers, as found by the jury, saw the defendant in the act of violating the law, they then acquired the right to make the arrest without a warrant.'' The Oklahoma court cites no authorities in support of its judgment, but whether the decision of the Oklahoma court is entirely in accord with the law of this State we

need not decide, as the facts surrounding the *McAdams* case are entirely different from those here presented.

The People contend that the arrest of defendant might be justified upon the ground that the officers, in making the arrest, did so to prevent the commission of a threatened felony. As there is no evidence in the record to warrant the contention that a felony had been committed or attempted, the instant contention is without the slightest merit. Between the date of the arrest and the time of the trial over a year had elapsed. Three or four officers were present at the time of the alleged outcry, ''Hold up,'' and within a few minutes a number of other officers were upon the scene, but, nevertheless, not a single witness was produced to show that a holdup had been committed or attempted. Indeed, Officer O'Neal testified that he did not even then know who it was that ''hollered, 'Hold up.' ''

The People further contend that in order to maintain a motion to suppress the evidence it was essential that defendant show that he was in possession of the property and that it was illegally taken from him, but that as he testified that the police officers did not take the gun from his person the motion to suppress was inconsistent with defendant's own testimony and therefore the trial court was justified in overruling the said motion. A like contention was raised in the case of *People v. Scalisi, supra,* p. 145, but it was there held that ''a defendant is entitled to the benefit of any defense shown by the entire evidence, even if the facts on which such defense is based are inconsistent with the defendant's own testimony.'' This is but a statement of the general law bearing upon the subject.

The People finally contend that ''the defendant by his own action exposed the concealed weapon and it was not necessary to, and the officers did not, make a search of his person,'' and ''there being no search, there could be no illegal search.''. Our bill of rights

(section 6) forbids unreasonable searches *and seizures.* A search is one thing: a seizure is another.

Defendant strenuously contends that the court erred in not discharging defendant at the conclusion of the State's case, since the evidence introduced by the People did not make out a case of carrying concealed weapons, and cites *People v. Niemoth,* 322 Ill. 51, and *People v. Moch,* 270 Ill. App. 621 (Abst.). While this contention is not without force, we deem it unnecessary to rule upon the same.

The judgment of the municipal court of Chicago is reversed, and as the People may be able to prove, upon a new trial, that a criminal offense had been committed, or attempted, just prior to the arrest in question, the cause is remanded.

*Reversed and remanded.*

SULLIVAN, J., concurs.

GRIDLEY, P. J., dissenting: On May 1, 1934, for reasons stated in an opinion then filed, this court ordered that the judgment of the municipal court be affirmed. Subsequently a rehearing was allowed. Under the present record, as I read it, I am unable to agree with the conclusions reached in the present majority opinion of this court, and am of the opinion that the judgment of the municipal court should be affirmed.