(No. 48568.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. STEVEN WIPFLER, Appellant.

*Opinion filed October 5, 1977.*

GOLDENHERSH and DOOLEY, JJ., dissenting.

Michael J. Goldstein and Sheldon Sorosky, of Chicago, for appellant.

William J. Scott, Attorney General, of Springfield (James B. Zagel, Assistant Attorney General, of Chicago, of counsel), for the People.

MR. JUSTICE RYAN delivered the opinion of the court:

Defendant, Steven Wipfler, was indicted and tried separately for two burglaries. Each was tried to the court, and each resulted in a conviction. He was sentenced to serve terms of four years' probation, the first 45 weekends to be spent in the Will County jail. Defendant appealed both convictions, contending that his confession, which was the cornerstone of the State's case at both trials, was the fruit of an illegal arrest or the result of coercion, or that it was obtained without a valid waiver by him of his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16

L. Ed. 2d 694, 86 S. Ct. 1602. The cases were consolidated for appeal. The appellate court, one justice dissenting, affirmed the convictions. (37 Ill. App. 3d 400.) The appellate court held that the defendant, at the inception of his station-house interrogation, was not under arrest, and so his subsequent confession did not result from an arrest made without probable cause. The court found, further, that the record of the hearing on defendant's motion to suppress supports the finding of the trial court that defendant made an uncoerced confession after being timely informed of his *Miranda* rights and knowingly and voluntarily waiving them. We granted defendant leave to appeal.

On the evening of February 4, 1974, an office trailer on a construction site in Bolingbrook, Illinois, was entered and set on fire. During the weekend of February 16, 1974, the Bolingbrook home of Jerald Kraushaar was burglarized and several items taken. During the investigation of the burglary of the residence the police officers contacted the occupants of adjoining residences making inquiries. At one house the officers talked to an 18-year-old boy whom they knew had a motorcycle. They told him they had seen motorcycle tracks near the house that had been burglarized. The youth stated that his motorcycle was inoperative but that he had seen Steven Wipfler and some other boys riding their motorcycles in that vicinity. The youth stated that if they wanted some information about the burglary they should contact Steven. At 8:30 a.m. on February 20, Detective Mahoney of the Bolingbrook police called the Wipfler home and was told by Steven's mother that Steven was at school. Mahoney told her that he would like to talk to Steven about some burglaries under investigation. She said she would tell Steven to go to the police station after school.

When defendant went to the station after school, he first spoke briefly with Police Chief Johnson, who had

allegedly been a sort of father image to defendant since the death of defendant's father. They did not discuss the burglary, but during the course of their conversation Chief Johnson said something to the effect that "if someone did something wrong he should be a man and admit it." Defendant was then asked to come into the sergeant's office, which was a room with two desks and about five chairs. Detective Kuntz was seated at one desk. Detective Mahoney sat at the other desk, and the defendant sat in a chair across the desk from Mahoney. The door was closed. According to the detectives no interrogation took place until defendant was read his *Miranda* rights. Defendant denies that he was so informed prior to questioning.

The interrogation focused at first on the Kraushaar burglary. Defendant was asked what he knew about the incident and initially denied having any knowledge of it. The detectives asked if he would take a polygraph, but he declined, admitting that he did have some knowledge of the burglary but was not directly involved. Defendant was then asked about the break-in at the trailer, and again his initial response was to deny any knowledge of it. After more questioning he once again admitted to having some knowledge of it but denied involvement. He said that the trailer was entered by a group of youths he had met that same evening, and that during the break-in he waited for them in their car. When he was unable to name any of these acquaintances or even to identify the kind of car he was in, Detective Mahoney expressed disbelief. Defendant then said he would tell the truth about everything. Both sides agree that at this point *Miranda* warnings were given. Defendant was allowed to examine a waiver form, which he then signed. Questioning continued, and defendant admitted participation in both burglaries. This confession came after a total of 45 minutes to an hour of interrogation. Defendant then drove home, followed by Mahoney and Kuntz, where he surrendered several items taken from

the Kraushaar home. Defendant was permitted to remain at home overnight but returned to the police station the next day.

Prior to trial the defendant moved to suppress his confession. Following a hearing the motion was denied and, as previously indicated, defendant was convicted of both burglaries.

Several issues are raised by this appeal. First, did the arrest of defendant occur when he entered the interrogation room, prior to the existence of probable cause, as defendant contends? Next, did defendant knowingly and voluntarily waive his *Miranda* rights? Finally, was defendant's confession the result of coercion by members of the Bolingbrook Police Department?

Both sides agree that there was no probable cause to arrest defendant until he admitted more than mere knowledge of the burglaries and agreed to tell the truth about "everything." Defendant argues that, therefore, he was illegally arrested at the time he was asked to enter the interrogation room with Mahoney and Kuntz. The position of the State is that no illegal arrest occurred because defendant was in fact not arrested until after he agreed to tell the truth and not at any earlier point in his interrogation. We agree with the position taken by the State.

In *People v. Clark* (1956), 9 Ill. 2d 400, we indicated that the elements of a valid arrest were present when the police informed defendant of a violation, he submitted to their control, and "[t]he evidence clearly shows *** that the officers *intended* to effect the arrest and that the defendant so *understood* them." (Emphasis added.) (9 Ill. 2d 400, 404.) Both the Federal courts and the appellate courts of this State have held that the intent of the officer and the understanding of the arrestee are two essential elements in the definition of arrest. (*Moran v. United States* (10th Cir. 1968), 404 F.2d 663; *Hicks v. United*

*States* (D.C. Cir. 1967), 382 F.2d 158; *Fisher v. United States* (8th Cir. 1963), 324 F.2d 775; *People v. Ussery* (1974), 24 Ill. App. 3d 864; *People v. Smith* (1971), 5 Ill. App. 3d 341; *People v. Bridges* (1970), 123 Ill. App. 2d 58; *People v. Jackson* (1968), 98 Ill. App. 2d 238; *People v. Mirbelle* (1934), 276 Ill. App. 533. For a discussion of the relevance of the state of mind of the parties in determining whether an arrest has occurred, see Cook, *Subjective Attitudes of Arrestee and Arrestor as Affecting Occurrence of Arrest*, 19 U. Kan. L. Rev. 173 (1971).) It is also clear, however, that the component of an arrest which courts have labeled the arrestee's understanding is not identical to the arrestee's subjective beliefs at the time of arrest. The accepted test of understanding is not what the arrestee thought, but "what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." (*Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 161; see also *People v. Howlett* (1971), 1 Ill. App. 3d 906.) Naturally, the beliefs of the individual arrestee, to the extent that they can actually be ascertained, are legitimate considerations. (*Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 161.) When, however, the apprehension engendered in an arrestee, even if such apprehension can be said to be reasonably held by the particular arrestee, does not coincide with what the reasonable, *innocent* man would have thought, then assessments of whether an arrest occurred must be guided by the reasonable man standard and not by the subjective belief of the arrestee. See *Coates v. United States* (D.C. Cir. 1969), 413 F.2d 371.

In the case at bar, the trial judge made the finding that defendant was not under arrest when his interrogation began. We believe that there is sufficient evidence in the record to support this finding, based upon the test of arrest articulated above. We cannot say that a reasonable, innocent man, under like circumstances, would have had

cause to believe himself arrested. Defendant went to the station voluntarily. He was aware that the police had tried to reach him that morning, knew where he was all day, but did not attempt to take him into custody. He was informed that the police wanted only to ask him questions about some burglaries. There were none of the procedures which the public associates with arrest—searching, booking, fingerprinting—which might, to an innocent man, have negated the statements of the police that he was simply being interrogated as a witness who, they had been told, could "shed some light" on the matter. (See *Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 162.) An innocent man could reasonably have concluded that the police viewed him as an important witness, and that they intended to, and expected to, elicit his cooperation. A reasonable, innocent man, however, would have been cognizant that this did not amount to arrest, in light of the total lack of compulsion by the police either in obtaining or retaining his presence at the station. "An assumption that one is required to cooperate with the police can hardly be equated with an arrest; every citizen has a duty to assist police officers up to the point of self-incrimination." *Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 161.

Having decided that a reasonable, innocent man would not have understood himself to be under arrest in this case, it is not necessary to our holding on this issue that we determine the intent of the officers. Nonetheless, we note that the manner in which defendant's presence was obtained, and the information the police had about defendant prior to interrogation, lends credence to the testimony of Officer Mahoney that defendant was not, in Mahoney's mind, under arrest at the time and that he could have left without police permission because there was "nothing to hold him for."

In summary, then, there is ample evidence to sustain

the finding of the trial court that no arrest occurred when defendant entered the interrogation room. What actually took place here was no more than what was minimally necessary for the police to successfully investigate a crime, as is their duty. They were informed that a certain individual might have some knowledge about two burglaries. They asked this individual to come to the station so that they could question him about the burglaries. To hold that this amounted to an arrest would be to hold that virtually any station-house interrogation is necessarily so custodial as to indicate that the person questioned has been placed under arrest. This would mean that the police could not request the presence of anyone, even for noncustodial questioning, unless and until they had probable cause to arrest the person to be questioned. We see no reason to so restrict the investigatory function of the police.

The next issue we must consider concerns the warnings to defendant of his *Miranda* rights, and his waiver of those rights. While the majority of the appellate court implicitly found that defendant, though not arrested, was the subject of custodial interrogation, the dissenting justice contended that there is no such thing as "an interim stage of custodial non-arrest" (37 Ill. App. 3d 400, 406). His assessment of this case was that defendant was in custody and was therefore under arrest. We believe, however, that both the assessment of the dissent and the assumption of the majority are mistaken; defendant was, in fact, not under arrest and also *not the subject of custodial interrogation.*

The rules of *Miranda* apply to admissions made by a defendant while he is in custody "or otherwise deprived of his freedom of action in any significant way." (384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.) Since the *Miranda* decision, courts have grappled with the question, in various factual settings, of whether an

individual who has not been arrested has nonetheless been taken into custody or otherwise deprived of his freedom in the *Miranda* sense. (See *United States v. Hall* (2d Cir. 1969), 421 F.2d 540; *United States v. Bastone* (7th Cir. 1975), 526 F.2d 971; *United States v. Scully* (2d Cir. 1969), 415 F.2d 680; *Freije v. United States* (1st Cir. 1969), 408 F.2d 100.) The most recent and most instructive word on the matter from the Supreme Court came in *Oregon v. Mathiason* (1977), 429 U.S. 492, 50 L. Ed. 2d 714, 97 S. Ct. 711. In *Mathiason*, defendant and a police officer agreed to meet at the State patrol office to discuss a burglary. Defendant entered a room with the officer, the door was closed, and after brief questioning defendant admitted to the burglary. The officer then advised defendant of his *Miranda* rights and took a taped confession. Defendant moved to suppress the confession as the fruit of questioning which had not been preceded by *Miranda* warnings. The Oregon Supreme Court agreed with defendant, and reversed his conviction, because the interrogation took place in a "coercive environment." (*State v. Mathiason* (1976), 275 Ore. 1, 5, 549 P.2d 673, 675.) The United States Supreme Court reversed, holding that the Oregon court had read too broadly the *Miranda* requirement of "custodial interrogation." The court, after emphasizing that there was no indication that defendant's freedom to depart was restricted, that defendant appeared voluntarily, and that he knew he was not under arrest, provided the following refutation of the theory that *Miranda* warnings should be required prior to any station-house interrogation.

> "Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one

suspected of a crime by a police officer will have coervice aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited." 429 U.S. 492, 495, 50 L. Ed. 2d 714, 719, 97 S. Ct. 711, 714.

In the case at bar, the record supports the interpretation that defendant was not compelled to come to the station, much less to answer questions, and that, regardless of defendant's subjective beliefs, he was not, and would not have been, forbidden to leave. The officers testified that he would have been permitted to leave because "there was nothing to hold him for." (See *Freije v. United States* (1st Cir. 1969), 408 F.2d 100, 102-03.) In short, when the situation is viewed objectively, defendant was not in custody or otherwise deprived of his freedom of action in any significant way, and so *Miranda* warnings were not required at the outset of the interrogation. As noted above, the officers testified that the *Miranda* warnings were given before any interrogation, whereas the defendant maintains to the contrary. Since no *Miranda* warnings were required at that point we need not consider this disputed question of fact. Even though the warnings may have been given, as the officers testified, these extra

cautious efforts are not determinative of whether the interrogation was custodial. A custodial situation cannot be created by the mere giving of *Miranda* warnings. *United States v. Akin* (5th Cir. 1970), 435 F.2d 1011, 1013; *United States v. Sicilia* (7th Cir. 1973), 475 F.2d 308, 311.

In addition to the timeliness of the warning of *Miranda* rights, the question whether defendant voluntarily and knowingly waived those rights is also an issue. This, of course, is a question for the trial court's determination (*People v. Simmons* (1975), 60 Ill. 2d 173, 181), not to be disturbed unless against the manifest weight of the evidence. Defendant asserts, however, that the trial court erred by failing to consider his age and intelligence and the circumstances of the interrogation when it determined that his signing of the waiver form was a knowing and voluntary waiver of rights. Defendant contends that *Simmons* requires that, in the case of a minor defendant's waiver of rights, the trial record must affirmatively show that the trial judge considered all the proper factors in assessing voluntariness. We disagree. This court said in *Simmons* that voluntariness "must be determined from 'the totality of the circumstances' [citation] and consideration must be given to 'both the characteristics of the accused and the details of the interrogation.' [Citation.]'" (60 Ill. 2d 173, 179.) Further, relying on *In re Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428, and *Haley v. Ohio* (1948), 332 U.S. 596, 92 L. Ed. 224, 68 S. Ct. 302, this court recognized that special care must be taken when determining the voluntariness of a minor's waiver of rights. It did not, however, require that a trial judge must recite a litany of the factors which guided him in his determination. On the contrary, in *Simmons,* the trial court record indicated that, in fact, the judge had stated that a borderline mentally retarded 16-year-old should be treated as an adult when being advised of his rights. Because of that, the case was remanded so the judge

could give due consideration to defendant's defects, as required by the opinion. (See also *People v. Turner* (1973), 56 Ill. 2d 201.) The instant case is, of course, not comparable. We have not been alerted to anything in the record which would suggest that the court's decision on voluntariness of waiver was made without considering "the characteristics of the accused and the details of the interrogation." The court was able to view the defendant on the witness stand and, on that basis, could have determined that defendant was possessed of sufficient intelligence to understand and knowingly waive his rights. Further, there is abundant support in the record for the belief that the interrogation up to the time of the waiver of rights was not coercive and cannot be said to have overborne defendant's will so as to stamp his signing of the waiver form as involuntary.

Closely related to the issue of voluntariness of waiver is the question whether the confession itself was voluntarily made. The above precepts and admonitions of special care apply equally in determining voluntariness on this issue. A concise statement of the general rules with regard to voluntariness of confessions is the following from *People v. Prim* (1972), 53 Ill. 2d 62, 70:

> "Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. [Citation.] In making its decision the trial court need not be convinced beyond a reasonable doubt, and the finding of the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence."

The trial court found that defendant's statement was voluntary. We do not think that this finding was against

the manifest weight of the evidence. We reiterate that we do not believe the interrogation itself was coercive either in its conduct or its duration. If, then, the statement was involuntarily made, defendant's will must have been overborne by some stimulus apart from the behavior of Mahoney and Kuntz.

Defendant's position is that Chief Johnson's counseling of him to tell the truth, when viewed as part of the total interrogation process, should be considered as coercive and as having compelled him to confess, since Johnson occupied a special position of trust in relation to defendant. Decisions of this court have firmly established that, in the absence of a suggestion of benefit to the defendant, mere exhortation to tell the truth does not render inadmissible a subsequent confession. (*People v. Taylor* (1974), 58 Ill. 2d 69; *People v. Joe* (1964), 31 Ill. 2d 220; *People v. Klyczek* (1923), 307 Ill. 150.) What we must decide today is whether an exception should be made to this rule in instances when the urging of honesty comes from one who is trusted by defendant.

Defendant, arguing for the exception, relies on *People v. Ruegger* (1975), 32 Ill. App. 3d 765. In *Ruegger,* the appellate court, upholding the trial court's finding of involuntariness, stated that "the unusual factor that defendant was interrogated by a relative may have added an element of subtle compulsion to confess." (32 Ill. App. 3d 765, 771.) We agree that the relationship of an interrogator to a party being questioned is a relevant consideration in assessing a statement's voluntariness. In the case at bar, then, if Chief Johnson's conversation with defendant were viewed as part of the interrogation process, the fact of his relationship to defendant would have been relevant even *without the admonition to tell the truth.* The exhortation to defendant to be honest adds nothing to this, since, as indicated in *Taylor, Joe,* and *Klyczek,* such advice can properly come from an interrogator. We do not

believe, however, that Johnson acted as an interrogator here. He did not discuss the burglaries with defendant and we, like the appellate court in this case, do not perceive a scheme between Chief Johnson and the detectives to "soften defendant" for interrogation.

The existence of this close relationship between Johnson and the defendant coupled with the admonition to tell the truth do not *per se* render the subsequent confession involuntary. This fact is another facet in the totality of the circumstances to be considered by the trial judge in determining whether the confession has met the test of voluntariness. In this case, after considering all of the evidence the trial judge found that the confession was voluntary. In *Ruegger,* the trial court, after considering the relationship of the interrogator with the defendant as well as the other evidence, found that the confession was not voluntary. In *Ruegger,* the appellate court concluded that the finding was not against the manifest weight of the evidence. In this case, we likewise conclude that the finding of the trial court is not against the manifest weight of the evidence. Since we reject defendant's contention that Johnson's admonition must be considered coercive due to their relationship, we see no reason to upset the trial court's finding that the defendant's statements were voluntarily made and were not the product of coercion.

We conclude that the arrest of defendant was effected subsequent to the existence of probable cause, that he knowingly and voluntarily waived his *Miranda* rights, and that the confession that followed was voluntarily made and was properly admitted in evidence. We therefore affirm the judgment of the appellate court.

*Judgment affirmed.*

MR. JUSTICE GOLDENHERSH, dissenting:

I dissent. Relying on *Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, the majority states: "The accepted

test of understanding is not what the arrestee thought, but 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.' (*Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 161; see also *People v. Howlett* (1971), 1 Ill. App. 3d 906.)" (68 Ill. 2d at 166.) Our research shows that this "accepted test" has been applied only in *United States v. McKethan* (D.C. Cir. 1965), 247 F. Supp. 324, *Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, and *Coates v. United States* (D.C. Cir. 1969), 413 F.2d 371. It is significant to note that in *McKethan* the district judge cited no authority in support of the proposition and that in *Coates*, written by the author of *Hicks,* a member of the panel concurred only in the result. It would be difficult, indeed, to reconcile the concept of an "objective standard" based upon the conduct of "a reasonable man, innocent of any crime" with the basic tenet of our system of jurisprudence that an accused is presumed to be innocent of crime until found guilty.

In *Hicks,* in distinguishing *Seals v. United States* (D.C. Cir. 1963), 325 F.2d 1006, the court said: "*Seals* \*\*\*, on which Appellant relies, is readily distinguishable from this case; Seals, unlike Appellant, was an acknowledged suspect at all times and the investigation was directed at his part in a robbery; furthermore, he was a high school student." (*Hicks v. United States* (D.C. Cir. 1967), 382 F.2d 158, 162.) It is clear from the majority opinion that Chief Johnson, who "had allegedly been a sort of father image to defendant since the death of defendant's father," said something to the effect that if "someone did something wrong he should be a man and admit it." (68 Ill. 2d at 164.) I find it difficult to understand any reason for the statement if at that time defendant was not "an acknowledged suspect." As in *Seals* he was also a high school student.

The constitutional rights which *Miranda* was designed to protect are so important that their effective exercise

should not depend on the type of judicial hairsplitting present in this and similar cases. The record shows that this 18-year-old defendant was taken to the sergeant's office in the police station, that Detective Kuntz sat at one desk, Detective Mahoney sat at the other, the defendant sat across the desk from Mahoney, and the door to the office was closed. It would be remarkable indeed if under those circumstances an 18-year-old high school student reached any conclusion other than he was in custody and that any attempt to leave would be unsuccessful. Assuming, *arguendo*, that the defendant's belief that he was not free to leave during the questioning was not "objectively reasonable," "[i]t has been noted that as a logical matter, a person who honestly but unreasonably believes he is in custody is subject to the same coercive pressures as one whose belief is reasonable; this suggests that such persons also are entitled to warnings. See, *e.g.,* LaFave, 'Street Encounters' and the Constitution, 68 Mich. L. Rev. 39, 105 (1968); Smith, The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation, 25 S.C.L. Rev. 699, 711-714 (1974)." *Oregon v. Mathiason,* 429 U.S. 492, 496 n.1, 50 L. Ed. 2d 714, 720 n.1, 97 S. Ct. 711, 714-15 n.1 (Marshall, J., dissenting).

As recognized by the majority, "The rules of *Miranda* apply to admissions made by a defendant while he is in custody 'or otherwise deprived of his freedom of action in any significant way.' (384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.)" (68 Ill. 2d at 168.) Clearly they applied here, and the confession which "came after a total of 45 minutes to an hour of interrogation" (68 Ill. 2d at 164) should have been suppressed.

MR. JUSTICE DOOLEY joins in this dissent.