THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
ELIZABETH VAISVILAS, Defendant-Appellee.

First District (1st Division)   No. 77-1958

Opinion filed March 26, 1979.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Rimas F. Cernius, and James V. Marcanti, Assistant State's Attorneys, of counsel), for the People.

Michael Buckley Bolan, of Chicago, for appellee.

Mr. JUSTICE McGLOON delivered the opinion of the court:

On February 27, 1976, two police investigators responding to a reported homicide searched a basement apartment at 5235 South Kilbourn in Chicago, Illinois, and discovered the body of Belinda Reyes. Based on an oral statement given to the police, Elizabeth Vaisvilas, the

defendant and younger sister of the deceased, was indicted for Belinda Reyes' murder. Pursuant to the defendant's motion, the trial court ordered that the statements be suppressed. It is from this order that the State now appeals.

The State's sole contention on appeal is that even though the suppressed statements were made outside of the presence of her attorney, the defendant knew and understood her right to remain silent and to have her attorney present and that she freely and knowingly chose to make the suppressed statement. The State thus concludes that the trial court erred in allowing the motion to suppress.

We affirm.

The defense called three witnesses to testify at the hearing on the motion to suppress. The first of these witnesses, Tom Vaisvilas, the defendant's husband, testified that at the time of the incident he and the defendant lived together in Justice, Illinois. At about 8 p.m. on February 27, 1976, Mr. Vaisvilas received a telephone call from Mr. Bolan, an attorney. Mr. Vaisvilas explained to Mr. Bolan that he would need his services and Mr. Bolan told him to call when the police arrived. Mr. Bolan also spoke over the phone to the defendant, but Mr. Vaisvilas did not hear their conversation. Approximately five hours later, two police investigators arrived at the house. As instructed, Mr. Vaisvilas called Mr. Bolan who spoke over the telephone to one of the investigators. At this time, Mr. Bolan also spoke to Mr. Vaisvilas and instructed him that his wife should go to the police station with the investigators, but that she should not provide the investigators with any statement. Mr. Bolan also indicated that he would meet them at the police station. Mr. Vaisvilas relayed this information to his wife who then left for the police station accompanied by the investigators and Laurie Savage, the daughter of the deceased.

The next witness to testify, the defendant herself, indicated that she first spoke with Mr. Bolan over the telephone on February 26, 1976. Mr. Bolan explained to her that he had been retained by her husband to represent her and that if some officers came to her house, she should not talk to them and that he would meet her at the police station. The defendant further testified that in the early morning hours of February 28, 1976, two police investigators arrived at the defendant's house. Upon the investigators' arrival, her husband made a telephone call. Investigator Boyle also had a conversation on the phone at this time.

The officers escorted the defendant to the police station where they led her to an upper floor room. There, Officers Boyle and Ptak asked her to give a statement. The defendant refused and indicated that she wanted to wait for her attorney. The officers left the room and returned with another officer. During this visit, Officer Ptak stated that "they had the

deceased's arrest record, knew what kind of person she was, and that whatever [the defendant's reason], * * * [the deceased] probably deserved it." When the defendant reiterated her desire to make no statements until her attorney arrived, Officer Ptak shouted "It doesn't matter if you say anything or not, because as soon as your attorney comes * * * he is going to be arrested." The officers then left the room. Officers Boyle and Ptak later returned. Officer Ptak accused the defendant of having a fight with the deceased the previous night and of feeling vengeful towards her. At Officer Boyle's request, Officer Ptak left the room. Officer Boyle then related to the defendant what "probably happened" the previous night between the defendant and the deceased. The defendant corrected him on several things as he related what he thought had transpired. These statements constitute the statements sought to be suppressed.

The defendant further testified that the officers then asked her if she wanted some coffee and informed her that her attorney was at the police station. She was permitted to see her attorney about 10 minutes after she made her statements.

On cross-examination, the defendant stated that the first time she spoke to Mr. Bolan was about 8:15 p.m. on February 27, 1976. She asked him to represent her and he advised her not to make a statement until he arrived at the police station. The police officers never told her she was under suspicion for murder. She said nothing in the car on the way down to the police station with the exception of telling Laurie Savage that she would probably be living with her grandmother.

The defendant did admit that Sergeant Boreczky advised her at the police station that she had the right to remain silent and that she, nevertheless, told police that she did not remember what happened on the day of the homicide. She also told the police that her deceased sister had mistreated the defendant's daughter. When the defendant met her attorney at the police station she told him that the officers had threatened to arrest him. The defendant also stated that prior to the night of the questioning she had been arrested for other offenses and had previously been questioned at a police station.

The third witness called by the defense was Michael Bolan, the defendant's attorney. Mr. Bolan testified that he first spoke with the defendant at approximately 8 p.m. the evening of February 27, 1976. During this conversation, he advised the defendant of her rights and told her not to make a statement to the police. When the police arrived at the Vaisvilas' residence, Mr. Bolan spoke over the telephone with one of the officers and told the officer that the defendant did not wish to make a statement.

Later Mr. Bolan arrived at the police station where, after a 15-minute

wait, he was permitted to see the defendant. Upon identifying himself to his client, the defendant stated, "They are going to arrest you."

The first witness to testify for the prosecution, Officer John Boyle, testified that at 3:30 p.m. on February 27, 1976, he and his partner, Investigator Ptak, received a radio communication from Sergeant Boreczky that an attorney had reported a homicide victim at 5235 South Kilbourn. The officers searched the apartment and discovered the victim's body. They could not, however, locate the victim's daughter. Sergeant Boreczky then called Mr. Bolan, the attorney who provided the original information, but Mr. Bolan provided no additional information. The police then went to Philip Reyes' house who told police officers that the victim's daughter was at the defendant's house.

Officer Boyle further testified that he and Officer Ptak then went to the defendant's home where Officer Boyle had a telephone conversation with Mr. Bolan. During that conversation Mr. Bolan never informed Officer Boyle that he had conversed with the defendant and that she did not wish to make a statement.

The officers then drove the defendant and Laurie Savage to the police station. While in the car, the defendant twice tried to speak and Officers Boyle and Ptak took turns requesting her to remain silent.

Upon arriving at the police station, the defendant was taken to the interviewing room where she was advised of her rights. The defendant indicated she understood these rights. Sergeant Boreczky then asked the defendant, "Why should you do something like this?" The defendant was uncooperative with Sergeant Boreczky, so Officer Boyle asked him to leave the room. Officer Boyle once again advised the defendant of her rights, which she stated she understood. Investigator Boyle then asked, "If you had anything to do with Belinda, there must be a reason why you don't want to tell me about it." The defendant then gave the 15-minute narrative statement which the trial court ordered suppressed. Officer Boyle then left the interviewing room to get defendant some coffee and learned for the first time that her attorney was at the police station. Officer Boyle testified that prior to giving her statement the defendant never indicated that she did not wish to make a statement nor did she ask for her attorney.

During cross-examination, Officer Boyle stated that while he was at the victim's house he discussed over the phone the possibility of having Mr. Bolan arrested. Officer Boyle explained that he was concerned about Laurie Savage's safety and that Mr. Bolan might have been obstructing justice in not offering any information concerning Laurie Savage. Officer Boyle, however, denied that he or anyone else in his presence ever told the defendant that her attorney would be arrested. Officer Boyle also indicated on cross-examination that after speaking to Mr. Bolan on the

telephone, he assumed Mr. Bolan would come to the police station and that nonetheless it was his intention to continue the investigation and not to wait for Mr. Bolan.

Also called by the State to testify was Officer Ptak. He indicated that during the ride to the police station the defendant twice tried to make a statement and was requested to remain silent. Officer Ptak stated that he did not participate in the questioning of the defendant.

The State contends in this appeal that the trial court erred in granting the defendant's motion to suppress her inculpatory statements. Although acknowledging that the defendant was the subject of a custodial interrogation and that *Miranda* was thus applicable (see *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), the State contends that the manifest weight of the evidence shows that the defendant was well aware of her rights and that she knowingly and intelligently waived those rights prior to making the inculpatory statements. We disagree.

■■ ■ Although the State correctly argues that the defendant's initial request for counsel is not irreversible, a statement given subsequent to a request for counsel and in the absence of counsel may be introduced into evidence only if it is voluntarily given and not made under the force of continued impermissible interrogation. (*People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56.) There is no requirement that the defendant expressly waive the right of counsel. The test in determining whether statements made in the absence of counsel are admissible is whether there exists a knowing intent to speak without counsel. (*People v. Brooks* (1972), 51 Ill. 2d 156, 281 N.E.2d 326.) However, if the interrogation continues without the presence of an attorney and the defendant gives a statement, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived her privilege against self-incrimination and her right to counsel. *Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758.

The determination of whether there was a knowing and intelligent waiver of defendant's privilege against self-incrimination and right to counsel rests upon the particular facts and circumstances of each case. (*People v. Markiewicz* (1976), 38 Ill. App. 3d 495, 348 N.E.2d 240.) It is only when the trial court's ruling on the above determination is contrary to the manifest weight of the evidence that we will reverse that ruling on appeal. *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.

■■ For the reasons which follow, we do not believe the trial court's decision ordering the statements suppressed is against the manifest weight of the evidence. It is apparent from Officer Boyle's cross-examination testimony that when he spoke to the defendant's attorney by phone he assumed the attorney would come to the police station and that

nonetheless he intended to elicit a statement from the defendant without waiting for defendant's attorney to arrive. In addition, it is uncontradicted that when the defendant's attorney did arrive at the police station, the defendant was still being interrogated and that in spite of this fact, her attorney was made to wait 15 minutes before seeing his client.

It is further apparent from the testimony of the defense witnesses that the police officers were aware of defendant's desire to remain silent until after she spoke with her attorney. Defendant's attorney testified that he spoke with the defendant over the phone and advised her of her right to remain silent and that she expressed a desire to rely on his advice and to not make a statement. Defendant's attorney further testified that he spoke to Officer Boyle on the phone and related the above conversation to him. Defendant's attorney also requested Officer Boyle not to interrogate the defendant. The defendant testified that twice while in police custody she told the officers she did not want to make a statement until her attorney arrived. Moreover, the defendant's testimony reveals that she made the inculpatory statements only after the following two comments were made to her by Officer Ptak: "Whatever your reason was she [the deceased] probably deserved it," and "It doesn't matter if you say anything or not, because as soon as your attorney comes, * * * he is going to be arrested." The only plausible reason for Officer Ptak's making the first comment was to entice the defendant into making some sort of statement. The second comment clearly had an intimidating effect on the defendant and a chilling impact on her right to counsel and her right to remain silent. This conclusion is supported by Mr. Bolan's testimony that the first thing she said to him at the police station concerned the police arresting him. Although the police officer did provide testimony concerning their reasons for wanting to arrest defendant's counsel, these reasons, even if justified, afforded no basis for telling the defendant, while in custody and being interrogated, that they would arrest her attorney.

It is true, as the State notes, that much of the testimony of the defense witnesses was contradicted by the prosecution's witnesses. However, in such a case the trial court is in a better position than this court to assess the credibility of the witnesses and to decide who is telling the truth. *People v. Goodrich* (1977), 48 Ill. App. 3d 141, 362 N.E.2d 798.

In addition, *People v. Gilbert* (1978), 58 Ill. App. 3d 387, 374 N.E.2d 739, and *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, the two cases principally relied on by the State to support its contention that the trial court erred in ordering the statements suppressed, are distinguishable from the instant situation. In *Gilbert*, there is no indication that the defendant ever requested counsel or ever indicated that he did not want to give a statement. Gilbert was read his rights and then asked if he

wished to give a statement. Gilbert then, without coercion of any sort, gave a statement. In *Morgan*, the defendant requested counsel at which point interrogation ceased. Later, while the assistant State's Attorney was attempting to obtain counsel for the defendant, a police officer visited the room in which defendant was placed and asked the defendant if he could complete his statement. After the defendant was again advised of his rights, he indicated that he did not want his attorney there because his attorney would only confuse him. Thereupon, the defendant gave an inculpatory statement. In both *Gilbert* and *Morgan*, unlike the instant situation, the defendants never asked for counsel or specifically rejected counsel. There was no evidence of coercion of any sort in those cases.

For the foregoing reasons, we affirm the order of the trial court suppressing the inculpatory statements.

Order affirmed.

O'CONNOR and CAMPBELL, JJ., concur.